**UNITED STATES of America, Plaintiff,**

v.

**Richard KELLY, Eugene Robert Ciuzio, a/k/a Gino Ciuzio, and Stanley Weisz, Defendants.**

**No. Cr. 80–00340.**

United States District Court,
District of Columbia.

May 13, 1982.

Roger M. Adelman and Stephen R. Spivack, Asst. U. S. Attys., Washington, D. C., for plaintiff.

Anthony S. Battaglia and Stephen J. Wein, St. Petersburg, Fla., for Richard Kelly.

Michael F. Dennis, Garden City, N. Y., for Stanley Weisz.

Eugene R. Ciuzio, a/k/a Gino Ciuzio, pro se.

John Diuguid and Joseph C. Woytash, Diuguid, Kennelly & Epstein, Karl Pilger, Washington, D. C., for Ciuzio.

## MEMORANDUM ON DUE PROCESS AND OTHER POST TRIAL MOTIONS

BRYANT, Senior District Judge.

Former Congressman Richard Kelly was found guilty of bribery, 18 U.S.C. § 201(c), conspiracy, 18 U.S.C. § 371, and violation of the Travel Act, 18 U.S.C. § 1952. Eugene Ciuzio and Stanley Weisz were found guilty of conspiracy, aiding and abetting, 18 U.S.C. § 2, and violating the Travel Act.

All three defendants have made motions to dismiss their indictments because the government violated due process, for judgments of acquittal, and for a new trial. Ciuzio has also moved for a severance and a new trial. For the reasons that follow, the court is dismissing the indictment against Kelly and granting new trials to Ciuzio and Weisz.[1]

I.

"Abscam" is a code word used by the Federal Bureau of Investigation (FBI) to identify an undercover operation which was originally intended to uncover securities fraud and recover stolen art treasures, and ended up with FBI agents and a master criminal posing as representatives of Arab sheiks attempting to persuade Congressmen to take bribes in front of hidden video cameras. The Second Circuit characterized this latter phase as a plan of the Executive Branch of the government of the United States "to determine whether members of the Legislative Branch and others would commit bribery offenses if presented with the opportunity to do so."[2] In another Second Circuit case, Judge Kaufman observed that "Abscam indeed was an intricate artifice, a stratagem of convoluted ploys and schemes designed to test the faith of those in the high echelons of government who are the repositories of the public trust."[3] In yet another related case, the Third Circuit pointed out that "the basic plan evolved into [the] various subparts, each with its own cast of participants which were ultimately the subject of [prosecution]," and emphasized that it was focusing on the particular facts material to the case which it had under consideration.[4] Abscam has also been referred to by the government from time to time as a "sting operation." I suppose, in a general sense, all these descriptions apply. However, in order to make the reasons for the disposition of this case very clear, a little more detailed treatment of this final critical phase of Abscam and the precise manner in which it related to Kelly is necessary.

In 1977, FBI agents prevailed upon a federal judge to allow a swindler and con man to remain free on probation after conviction for mail fraud in exchange for a promise to cooperate with the Bureau in some of its endeavors against organized crime.[5] This convict, Melvin Weinberg, stated flatly that his motivation to work for the FBI was "that I could make some big money."[6] Shortly after the FBI intervention, Weinberg was hired on a monthly basis to be a principal participant in the earlier phase of Abscam, i.e., the securities and art aspects. In January 1979, shortly after Agent Amoroso took over as Weinberg's immediate supervisor, Amoroso recommended that Weinberg's pay be raised from $1,000 per month plus expenses to $3,000 per month plus expenses because, among other reasons, Amoroso was concerned that Weinberg would "try and con other people on the side" if his living habits were not kept up.[7] This regular income was supplemented by substantial bonuses from time to time. Meanwhile, the field agents and Weinberg were maintained on a living stan-

---

1. The government has submitted, in its brief of October 30, 1981 at n.2, that the relevant evidence for the due process issues includes the entire record in this case as well as in the other Abscam cases. The defendants have cited evidence from other cases in their briefs. The court agrees that any evidence of government conduct which affected the defendants in this case is relevant, and has therefore considered that evidence as reflected in the transcripts and exhibits from the other due process deliberations.

2. *United States v. Myers*, 635 F.2d 932, 934 (2d Cir. 1980).

3. *United States v. Alexandro*, 675 F.2d 34 at 43 (2d Cir. 1982).

4. *United States v. Jannotti*, 673 F.2d 578 at 581 (3rd Cir. 1981).

5. Tr. at 1553–60. "Tr." refers to the trial transcript in this case. References to transcripts or exhibits of other proceedings are preceded by the name of the case from which the transcript or exhibit comes. *See* note 1.

6. Tr. at 1557.

7. Tr. at 1027–30.

dard consistent with great wealth.[8] Not long thereafter some white collar crime was uncovered in the Immigration and Naturalization Service.[9]

The record reflects that the last of the various "subparts" or "convoluted ploys," which ultimately resulted in the indictment of several Congressmen, was conceived—lock, stock, and barrel—by Weinberg and made its first appearance on July 14, 1979 in a conversation with George Katz, a defendant in another case.[10] Up until the time that the tape of this conversation was reviewed sometime within the following two weeks, apparently nobody in the FBI had entertained the notion of testing the virtue of legislators with the investment/immigration problem scenario.

This scenario was indeed "an intricate artifice." As Weinberg told Katz, the Arab sheiks, who had been investing in the United States, were afraid that there would come a time when they would have to flee their country because of internal problems, as did the Shah of Iran. To insure against any problems they may have with immigrating to the United States, Weinberg said the sheiks wanted to "sign up" as many Congressmen and other public officials as possible.[11] The Congressmen's commitment would be secured with promises of investment in their districts and payments of cash to them.

Apparently the FBI quickly approved the new phase of the operation, and Weinberg used his connections with other con men and criminals to spread the word that $25,000 would be paid to Congressmen and $50,000 would be paid to U. S. Senators for their help.[12] More money would be paid when the sheiks actually got into this country.[13] This money was in addition to the millions of dollars of legitimate investments which would be directed to the districts of helpful Congressmen.

The anticipated effect of this offer was that persons would be encouraged to bring the offer of investments and cash to the attention of Congressmen in the hope of getting a piece of the action. Weinberg characterized his announcement as "setting out a honey pot" and then just sitting back and waiting. As was to be expected, Weinberg's proposition activated some hustlers and con men with varying degrees of expertise who were anxious to cash in. Inasmuch as the contacts between the middlemen and the Congressmen were not moni-

---

8. Tr. at 1358. *See also, United States v. Jannotti*, 501 F.Supp. 1182, 1193–94 (E.D.Pa.1980).

9. *Alexandro.*

10. *Myers* due process exhibit 58 at 11–24, is a transcript of a conversation on July 14, 1979 between Weinberg and Katz.

The evolution of the public explanations for the origin of the asylum scenario itself raises interesting questions which need not be answered here.

Weinberg first testified about the origin of the asylum scenario in the *Jannotti* due process hearings before Judge Fullam in Philadelphia. There, he said that the idea first occurred to him while on a yacht on July 26 as a result of a suggestion by Criden. *Jannotti* due process at 3.86–3.87. Amoroso testified at the same hearing that *he* thought of the scenario the day before they were on the yacht as a result of a July 25 newspaper article about former Nicaraguan dictator Somoza's immigration problems. *Id.* at 5.148–49. In the Brooklyn due process hearings, Amoroso repeated the newspaper article story. *Myers* due process at 4107. However, he later admitted that his review, prior to the July 26th meeting, of the Weinberg-Katz tape, where the entire scenario was discussed, might have had "some bearing in [his] mind" when he suggested the asylum scenario on July 26. *Id.* at 4109.

The government's assertion in oral argument, *Kelly* due process at 180–83, that the genesis was prompted by an ad lib by Amoroso on July 26 and that the idea was merely passed along by Weinberg and Amoroso after being "originated by Errichetti, Criden and Congressman Myers," *id.* at 182, is not in accordance with the record. And neither is the government's latest representation to the effect that "Abscam was not the creation of Weinberg" if the term *Abscam* is meant to refer to the asylum scenario. There is no evidence of the originator of the initial Abscam concept—the securities and art recovery project—but the record is absolutely clear that the final phase which was directed at Members of Congress was Weinberg's brainchild.

11. *Myers* due process exhibit 58 at 11–24.

12. Tr. at 1090–91.

13. *Id.*

tored, the Bureau had no first-hand knowledge of whether both the legal and illegal aspects of the deal were presented to the Congressmen, and what the responses were.

The scheme affected Kelly in the following fashion. William Rosenberg, goaded on by Weinberg and Amoroso with promises of millions of dollars for various chores undertaken on behalf of the enterprise,[14] passed the word to, among others, Stanley Weisz. Sometime later, Weisz mentioned the general proposition to Gino Ciuzio who had become acquainted with Congressman Kelly in the fall of 1979.

After a series of phone calls, Rosenberg and Weisz put Ciuzio in contact with Weinberg and a meeting was arranged for Ciuzio, Weinberg, and Agent Amoroso (who used the alias Tony DeVito). At this meeting, on December 19, 1979, Ciuzio went to great lengths to make it appear that he had virtual control over the Congressman, indicating at the time that Kelly was dishonest and was already taking money and had various other weaknesses. He indicated that he had known and cultivated Kelly for about 2½ years.[15] None of this was true. No attempt was made to verify it;[16] and there is no indication that Weinberg and Amoroso believed it.

This meeting amounted to a briefing for Ciuzio, who wanted to know the details of Weinberg's proposition. Ciuzio was filled in by Amoroso and Weinberg and instructed as to how to make his pitch to Kelly. Indeed, at one point during this briefing, Ciuzio said: "Whatever program you feed into me, I'll give it to him."[17] The program, of course, included the very attractive investment in the Congressman's district on the one hand, along with the proposal to buy his assistance in any immigration problem. Also during this briefing, Ciuzio sought to convince Weinberg and Amoroso that if they would just give him the money they would have nothing to worry about—"I'll take a bag of money and we are through with the whole thing."[18] The money, by the way, was no longer $25,000, but had been raised by Ciuzio to $250,000, or as he put it, "a quarter mill." To this proposition Weinberg quickly said: "That's agreeable."[19] Obviously, Weinberg was authorized to dangle any amount of money before the middlemen in order to accomplish their purpose.

Ciuzio then went to Kelly and apparently fed him the program he had been given. At the trial of the case, the uncontradicted testimony of both Kelly and Ciuzio was that when Ciuzio told Kelly that money was available for him, Kelly rejected the idea of a pay-off, but at the same time expressed interest in the legitimate bait, that is, the enormous investments which were proposed for his district.[20] Thus, the only evidence presented at trial shows that when the bribe was first offered to Kelly, by Ciuzio, it was rejected.

Finally, a meeting was set up for January 8, 1980 at the FBI's townhouse in Washington at which Kelly was to meet the representatives of the Arab sheiks. Soon after arrival at the townhouse Ciuzio, in a one-on-one confrontation with Weinberg,

14. Tr. at 1073. Rosenberg has pled guilty in this case to conspiracy to bribe and defraud the United States.

15. Government exhibit 1(b) and (c) at 15–39.

16. Tr. at 4123-24, 1115–16. FBI Director Webster has testified that since the middlemen do not know they are dealing with the FBI and are not monitored or controlled, "[w]e must, therefore, carefully evaluate any information they provide us as to the willingness of a third party to engage in a crime before we proceed further, and assume that if such a third party does meet with us, he is aware of the criminal nature of the meeting." *Myers* due process exhibit 110 at 24.

17. Government exhibit 1(b) and (c) at 30.

18. *Id.* at 19. Ciuzio sought to convince Weinberg and Amoroso that he had such control over the Congressman that it was unnecessary for them to deal with Kelly and that Ciuzio himself would guarantee that what they wanted would in fact be done. Weinberg and Amoroso insisted on some contact with the Congressman and began to tell Ciuzio how to make his pitch.

19. *Id.* at 17.

20. Tr. at 2663–66, 2851–57, 3046–48.

**368**

made a frantic and what appears to be desperate argument against offering Kelly any money. Unbeknownst to Ciuzio, this encounter was videotaped. In an unrecorded meeting between Ciuzio and Amoroso in a hallway, a similar conversation occurred. During the Ciuzio-Weinberg encounter, Ciuzio immediately told Weinberg that Kelly had indicated to him that he would not take any payoff for what he would do for the sheiks.[21] Later, the conversation went as follows:

Ciuzio: Now, here's what I'm telling ya. He's a kid and I know he's ripe for the first big ... score. This a Congressman, ya understand? This ain't a ... hustler, cause we're hustlers. We're wise guys ... shake hands ... budabomb ... budabomb ... buda ... It don't mean nothin, ya know what I'm saying? Don't hand him no ... money, don't talk money, tell him what the problem is, how could ya help, he'll explain it ...

Weinberg: I don't know, ya gotta speak to him. That may be a problem, Gino. Why don't you ...

Ciuzio: Listen, let me tell ya what you're buying here, ok. You know this. Cause maybe this is his first shot in this role, all right? He ain't buying no ... Congressman. He's buying the vehicle to accomplish your package, ya follow? He ain't s ... let me tell ya somethin ...

Weinberg: Sit down a second and we can talk.

Ciuzio: Now let me explain it ta ya this way. Now that we're here, see, cause I make ... things happen. With a little miscommunication with the other two guys and you, you get nervous ya know, makin' a big deal. It's a big deal if it goes wrong.

Weinberg: Yeah, but you ... we gotta make sure ...

Ciuzio: You can't usurp the guy's position.

Weinberg: Ok, but you understand ...

Ciuzio: He just left, ya understand? ...

Weinberg: we're talking ... all right, we're talking about if he trusts you ...

Ciuzio: Who? The Congressman? ...

Weinberg: ... and if you if he trusts you, right? ...

Ciuzio: Yeah.

Weinberg: Let Tony hand you the money in front of him. Long as we know he's getting money ...

Ciuzio: That's ok. But don't say hey, Congressman ... ya know what I mean? Ya can't make him a ... hood, ya know.

Weinberg: No, but he's gotta know that he's getting paid to do it, ya know the ...

Ciuzio: Maybe he's got the answer ...

Weinberg: But the guy ain't lilly white, ya know. God forbid he backs out.

Ciuzio: I'll vouch for the guy.

Weinberg: Yeah, but ... you remember ...

Ciuzio: Listen, listen to me ...

Weinberg: ... if somethin goes wrong, it's our jobs ...

Ciuzio: Listen to me, do you trust, ahh Bill?

Weinberg: Yeah.

Ciuzio: I mean he talks good about you.

Weinberg: Hey ...

Ciuzio: All right. If you don't feel that way about him, ya know, what ... wha ... I know ya gotta little problem here with Tony. Because if you say suppositions ... there the ... guy, one time, the guy came .. This is the Congressman, I brought ... pictures in the newspaper to prove it to ya. This is the guy. I gave it to Bill, show it to Mel, I show it to Tony ...

Weinberg: Well, he knows he's getting money right?

Ciuzio: He ain't taking no ... money in his hand.

Weinberg: All right, you'll take it ...

Ciuzio: All right ...

Weinberg: ... he'll hand it to you.

Ciuzio: ... and I want to tell you another thing ...

21. Government exhibit 2(b) and (c) at 1.

Weinberg: Yeah.

Ciuzio: ... and nobody out there's getting no ... money. I'll have no response to the money. If, if nottin happens here, if you give us the money, he don't do it, I'll give you the ... money back.

Weinberg: Well, that ain't the idea. The problem ya know, Gino let me tell you ...

Ciuzio: Ya know this has, like, been a one-way deal.

Weinberg: We we look, we don't mind paying the money. But we gotta problem that we go to Yassir and we say ta him, we laid it out, he said did you give it to the Congressman, we don't care the first twenty-five goes to him, the rest I told ya, I'll deliver to you.

Ciuzio: I told ya before on the phone, because it's hard on the phone, ya know what I mean? I can't tell you ... you're gonna get killed by a ... car tomorrow.

Weinberg: Yeah but you don't

Ciuzio: We understand that

Weinberg: ... we're not, Tony'll tell him that we're not asking for a guarantee.

Ciuzio: I don't wanna have to give the guy a ... bribe. That's what I'm telling ya.

Weinberg: Well ...

Ciuzio: It ain't necessary, ya know what I mean?

[Tony DeVito (in another room): How bout some ahh, do we have any club soda?]

Weinberg: But the idea ...

Ciuzio: I don't like to talk ta him like that. I talk ta him in a different way.

Weinberg: It's not that, hey ... we believe ...

Ciuzio: Here's the kind of guy that says listen now, hey if it helps you, God bless you. I don't want nothing, I owe you one, and he goes, listen if you could find a buyer for my real estate ...

Weinberg: But this is a different ... but this is a different story Bill told us, now wait a second, let me tell ya ...

Ciuzio: I don't know what Bill told ya.

Weinberg: I'm talking ... and Weisz.

Ciuzio: We went through this once before you and I ...

Weinberg: Weisz said to me, the way we laid it out, the guy was coming here and we were to tell him that it's a hundred thousand for him ...

Ciuzio: No sir, no ... way you gonna tell him that ...[22]

....

Weinberg: No no, I laid the whole thing out with him ...

Ciuzio: ... Because he was putting stipulations ...

Weinberg: I laid ...

Ciuzio: about the money ...

Weinberg: Well maybe he has stipulations ...

Ciuzio: ... the escrow, front money now, and ... this and that guarantee.

Weinberg: No no, he no no. The problem was, here's the deal I made with him. Twenty-five now to him and he says it goes one on one in the room. I says good enough, one on one. I will not be there, it'll be just Tony ...

Ciuzio: I'll tell you what his answer will be ...

Weinberg: Wait, wait let me finish ...

Ciuzio: ... he's gonna have ta talk to him.

Weinberg: Wait, second thing was that the balance of the money, when we call up within a week or two, ta go, I would deliver him the balance when I say go, anywhere he wants in a suitcase, all right, the other two hundred and twenty-five thousand, and that's it and then we don't even ... want to see you ...

Ciuzio: Who you gonna deliver it to?

Weinberg: It's to Weisz.

Ciuzio: Ohh, that's all right with me, I don't give a ...

Weinberg: All right? And there was no, I don't ever want to see the Congressman no more. All we want to know is the guy is working for us, he's gonna do our bidding and that's all we want to know.

**22.** *Id.* at 2-6.

Ciuzio: went through all this .... If he's here, I've told him the whole ... thing. Know what his answer was to me?

Weinberg: ... what?

Ciuzio: Naah, I owe ya one. But you know I've got two pieces of property in ahh ... St. Petersburg. Yeah it's sold. That's the way he talks.

Weinberg: See we can ... we can't, we look ... let me explain. We can't pay a quarter of a million dollars and the guy is gonna say he owes ya one ...

Ciuzio: Let me tell ya somethin, I'm gonna tell ... I'm gonna punch a hole right in your logic .... You're gonna make a ... hoodlum outta him for twenty-five thousand. You're gonna try ...[23]

Although we do not have a recording of the conversation, the testimony shows that during the Ciuzio-Amoroso meeting, Ciuzio also tried to impress Amoroso with the fact that no money should be offered to the Congressman.[24]

Finally, the Congressman met with Amoroso alone. Soon after sitting down in the privacy of a separate room, Amoroso proposed a payment of money to Kelly. The Congressman told him that he was interested in the investment in his district but that whatever arrangements Amoroso had about paying money for his help with immigration, he had "no part in that."[25] Amoroso was not deterred. He intimated that the large investments could very well be made somewhere else in the country and brought up the illegal payments again. Again the Congressman told him that he was there to talk to him about the investments in his district and tried to keep the conversation on that subject. At the trial, Amoroso explained his tenacity: "Well, because I wasn't clear in my mind as to what the Congressman was really thinking about or what he was sure of. Until I could clear it up in my own mind, I did not want to give him any money."[26] When it appeared that Amoroso was not making headway on the bribery offer to the Congressman, a government attorney, John Jacobs, who was stationed in a basement room set up to monitor the happenings upstairs called up from downstairs to Amoroso.[27] Although the house was wired and set up with cameras and recording equipment, no record of the conversation was made. What transpired on that telephone and the purpose of the call were the subject of the most vague recollection, but it was ultimately conceded by both parties that Jacobs told Amoroso that Kelly was "being cute."[28] Amoroso stated that he received no instructions from Jacobs, although Jacobs was monitoring the meeting for the purpose of giving advice. At any rate, after the telephone call Amoroso persisted with Kelly and not too long thereafter, when $25,000 was displayed to him spread out in packets of $100 bills, Kelly accepted it as the initial payment of a $100,000 bribe.[29]

## II.

Up to now, courts have been unambiguous in recognizing the function of law enforcement as preventing and detecting crime and apprehending criminals.[30] There is also general acceptance of the proposition that in order to fulfill these traditional functions, it might become necessary to resort to those techniques which frequently give rise to the claim of entrapment, i.e.,

23. *Id.* at 8–9.

24. Tr. at 1139–40, 1171–72, 1175.

25. Government exhibit 2(b) and (c) at 16–17.

26. Tr. at 1178.

27. Government exhibit 2(b) and (c) at 18; Tr. at 1178–80.

28. Tr. at 1181, 1392.

29. Government exhibit 2(b) and (c) at 28.

30. *United States v. Russell*, 411 U.S. 423, 434, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973); *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 820, 2 L.Ed.2d 848 (1958); *Sorrells v. United States*, 287 U.S. 435, 441–42, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932).

artifice, deceit, and stratagem.[31] I fully appreciate the need for and the value of aggressive, resourceful, and innovative law enforcement in our modern society which far too often is beset with diabolical criminal conduct so sophisticated as to be nearly impossible to detect. I agree with Judge Kaufman that, "carefully devised and supervised covert investigations often are the only means of discovering breaches of the fundamental mandate of one's office."[32]

However, as Abscam affected Kelly, it was not the type of carefully devised and supervised covert operation generally accepted by the courts. In many respects it differed sharply from traditionally accepted types of operations.

I know of no reported case where at least some inkling of corruption was not the forerunner of undercover activity in a bribery prosecution. When Weinberg first passed the word that money would be paid to a Congressman for immigration help and that large amounts of money were available for investment, no one in the government had even the remotest suspicion about the existence of any prior, on-going, or imminent criminal activity of this type either as to its existence in general or the participation of any individual.[33] In other words, there was nothing to trigger traditional law enforcement activities until the government made its overtures through those who were attracted to the honey pot and thus became middlemen.

The government, for obvious reasons, vehemently seeks to disclaim any government involvement beyond Weinberg and to disown Rosenberg, Weisz, and Ciuzio as its agents. But this position is patently untenable in the face of the evidence.[34] It is obvious that although Rosenberg, Weisz, and Ciuzio were unaware of it, they were programmed to one end, i.e., to bring in some Congressman, and in this case it was Kelly, for the purpose of accepting a bribe. Amoroso admitted this on cross examination:

Q: So on December 19, 1979, you were offering a bribe to Congressman Kelly?

A: Through Mr. Ciuzio, yes.[35]

Thus, as it affected Kelly, Abscam was not a traditional sting operation. It had a feature unknown to any sting operation that I know of. This consisted of a recruiting agent who was programmed to go out and use a formula supplied by the point man of the operation, which included a strong legitimate attraction. This formula containing legal and illegal bait was used to persuade the Congressman to become a sting patron.

The ordinary sting, on the other hand, is nothing more than a passive operation which serves as an attraction for those who become criminals under their own power, certainly with no help from anyone connected with the sting. This difference can be illustrated as follows. Persons who patronize a "fence" operation set up by police are thieves who have already committed crimes when they contact the sting. In another standard motif, police officers disguise themselves as elderly persons sitting in a park which has been plagued by robberies and muggings and, while under proper surveillance by cooperating officers, wait to be victimized by whoever gets the notion to rob them. In neither instance do we have officers, or persons programmed by them, canvassing the neighborhood with legitimate incentives designed to encourage apparently innocent persons to take advantage of the sting operation.

The unique nature of Abscam was not lost on some of the participants. Robert C. Stewart, the Attorney in Charge of the Newark Strike Force, wrote that there is a

---

**31.** *Russell*, 411 U.S. at 434, 93 S.Ct. at 1644; *Sherman*, 356 U.S. at 372, 78 S.Ct. at 820; *Sorrells*, 287 U.S. at 441, 53 S.Ct. at 212.

**32.** *Alexandro*, at 43.

**33.** Tr. at 1352–56.

**34.** *Sherman*, 356 U.S. at 374–75, 78 S.Ct. at 821–22; *Johnson v. United States*, 317 F.2d 127, 128 (D.C.Cir.1963).

**35.** Tr. at 1123.

fundamental difference between the subject matter of a conventional "sting" operation and that of the present operation. In the former, the subject matter under discussion (such as a stolen television set in the hands of a junkie thief) is contraband per se and any discussion about it is ipso facto incriminating. The suspect's mere presence in an ostensible "fencing" location with an item which is being offered for sale at a fraction of its face value provides more than an adequate basis for further investigative action—namely, recording the suspect's conversations about the contraband item. In the present investigation, the circumstances are fundamentally different because there is nothing inherently illegal about either the nature of the meeting place or the general topic of conversation. Indeed, absent specific facts to the contrary, there is an initial presumption of legality because of the positions which the suspects occupy and because of the ostensibly legitimate nature of the things under discussion—whether those things be the operation of a business, economic development in a particular area, or the protection of the human rights and indeed the very life of a foreign national who is touted as nothing more than a legitimate entreprenauer. Hence, the decision for further investigative action cannot be controlled by the criteria which govern such decisions in a conventional "sting" operation, but must depend instead upon the demonstrable existence of special facts which infect the particular transaction with illegality.[36]

In another memo Mr. Stewart emphasized the extent to which Abscam deviated from a conventional sting operation:

> Usually, there is little or no evidence that the official knows anything about the intermediaries' representations.

There may be little, if any, extrinsic information which would suggest that the particular official is corrupt. On the contrary, most of the officials begin the conversation with disclaimers of criminal intent and offers to handle the problem in a perfectly correct and lawful manner. The Undercover Operatives then press, and they dangle large sums of money in front of the official—initially with promises that he will never be required to deliver the quid pro quo because the payment is only insurance against a remote contingency. The official relents and accepts the payment—in some cases offering to perform further criminal acts, in others without providing additional evidence of predisposition or criminal intent. In several cases the payment was refused.

All of this is very different in kind and quality from a conventional sting operation.[37]

Persons at the upper levels of the Department of Justice and the FBI apparently assumed that the Congressman who would show up at the townhouse, or at any other meeting place they chose, would have already agreed to take a bribe directly or indirectly, and have thus characterized the Congressman's actions as "self-selecting." However the operatives had no reason to believe that, at least so far as Kelly is concerned, since the script given to Ciuzio had both legal and illegal bait; and Kelly's appearance at the townhouse did not indicate which type of bait he was responding to.[38] As a matter of fact, the operatives in the field did not believe that Kelly came for the purpose of getting a bribe. Weinberg testified that the reason he was not going to give the money to the middlemen as conduits for the Congressman was because he believed that if he did so "[t]hey would go north with it" and the Congressman

---

**36.** *Myers* due process exhibit 15 at 3–4.

**37.** *Myers* due process exhibit 16 at 8–9.

**38.** At least one public official came to the townhouse without any criminal intent. Senator Larry Pressler came to the townhouse and left when he discovered that a bribe was involved. It is difficult to understand how the government can characterize this procedure as "self-selecting" when it does not know what reason has brought a public official to its door. *See* tr. at 1389.

would never know anything about it.[39]  He also said: "I believe if we gave him [Ciuzio] the money he would have kept the money." [40]

Although the Department of Justice and the FBI disavow any purpose of testing the virtue of members of Congress,[41] that in fact appears to have been the sole objective of the operation.  In the case of the defendant Kelly the evidence points unwaveringly to this conclusion.  Given the concession that there was not even a scent of suspicion of criminal conduct, past, present, or imminent, or of criminal behavior by Kelly or any other individual, that no investigation in this regard was underway,[42] and the firm belief that if Ciuzio got his hands on the money the Congressman would never know anything about it, no other objective can emerge except that of testing virtue, or as Judge Kaufman stated in *Alexandro*, "to test the faith of those in the high echelons of government." [43]  Either that, or the patently unacceptable objective—prosecution for the sake of prosecution.

## III.

As Judge Newman observed in *Myers*, this added dimension to the law enforcement process, "inevitably raises sensitive issues of public policy and public law." [44]  If called upon to debate the wisdom and/or propriety of accepting this notion as an added function of law enforcement in our system, I would unhesitatingly urge that it not be done.  I readily admit that the notion is offensive to me.  Government agents, hard about the business of corrupting public officials who are free of suspicion, essentially subvert our government; and on its face this presents an unwholesome spectacle.  This is particularly true with respect to the manner in which Kelly was handled.[45]

I am aware of the admonition to trial judges that they are not privileged to dismiss a case against a criminal defendant because they do not like the case or because they have some strong personal aversion to the government's conduct, and that this standing alone is not a sufficient basis for determining that such conduct is outrageous to the point of depriving a defendant of due process.[46]  But, at the same time, it is inevitable that a strong visceral reaction provides the starting point or triggering mechanism which ultimately leads to the assessment that conduct is so outrageous that it transcends any standard of fundamental fairness.  Aware that what is repugnant to me may not be repugnant to the Constitution, I have sought to identify some discernible line between that conduct which arouses my personal resentment, and that which falls short of minimal standards of fairness.

■  To identify that line I need not resolve the debate over the validity of virtue testing because it is not necessary for the disposition which I make of this case.  Assuming *arguendo* that this new function of law enforcement is an acceptable proposition, the application of the testing procedures in this case patently exceeds the outer limits of any concept of fundamental fairness.

39.  Tr. at 3809.

40.  Tr. at 3817.

41.  FBI Director Webster said, "We are not in the business of testing morality."  *Myers* due process exhibit 110 at 50.

42.  *See* note 33 and accompanying text.

43.  675 F.2d at 43.

44.  *Myers*, 635 F.2d at 934.  That court expressly reserved judgment on the due process claim.  *Id.* at 938 n.6.

45.  On January 7, 1981 at a bench conference during the trial of this case, I expressed strong disenchantment when I said: this case "has an odor to it that is going to be cleared away before anybody gets convicted.  It has an odor to it that is absolutely repulsive.  Let's get along with the trial . . . .  But it stinks."  Tr. at 2547.

46.  *Hampton v. United States*, 425 U.S. 484, at 490, 96 S.Ct. 1646 at 1650, 48 L.Ed.2d 113 (plurality opinion of Rehnquist, J.), 494 (Powell, J. *concurring*); *Russell*, 411 U.S. at 435, 93 S.Ct. at 1644.

■ The litmus test—or temptation—should be one which the individual is likely to encounter in the ordinary course.[47] To offer any other type of temptation does not serve the function of preventing crime by apprehending those who, when faced with actual opportunity, would become criminals. Instead, it creates a whole new type of crime that would not exist but for the government's actions.

When improper proposals are rejected in these virtue-testing ventures, the guinea pig should be left alone. In ordinary real life situations, anyone who would seek to corrupt a Congressman would certainly not continue to press in the face of a rejection for fear of being reported and arrested. The FBI of course had no such restraints in this case.

After Kelly rejected the illegal part of the offer when Ciuzio first proposed it, that should have ended the matter. However, since the government did not make this first offer through an official, nor did it monitor Ciuzio when he made the offer on behalf of the government, it did not know that Kelly had already rejected the pay-off.

If the government did not end the testing of Kelly when he rejected Ciuzio's offer because of its ignorance of Kelly's response, it should have ended the testing when Ciuz-io reported to Amoroso and Weinberg on January 8th, in vehement language, that Kelly had rejected the offer and insisted that no offer be made.

Finally, after the government heard Kelly himself reject Amoroso's offer, with the words "I got no part in that," the testing should have ended. Since the government made its initial offer through Ciuzio, it had no way of knowing whether Kelly was just "being cute" or was in fact rejecting the offer. However frail one's integrity might appear, it should not be subjected to repeated assaults because of some overzealous attorney's cynical determination that the person is just "being cute." In the absence of any credible evidence that the show of integrity is some kind of ploy, or some evidence that criminal conduct has been committed by the target, he should be deemed to have passed the test.

Recognition of this minimal standard of fundamental fairness apparently prompted FBI Director Webster, according to Assistant Attorney General Philip Heymann, to direct the agents to be sure that they turn away anyone if there was any ambiguity about whether he was at the townhouse to take hundred dollar bills in exchange for a legislative act.[48] Whether this was out of

---

47. Assistant Attorney General Philip Heymann testified before the House Judiciary Subcommittee on Civil and Constitutional Rights in hearings, immediately after Abscam became public, that it is a "guarantee of fairness" to the individual when the transaction is modeled after reality "because it means that anybody who is brought in, is brought in with the same type of temptations that we know is floating out there." *Myers* due process exhibit 110 at 34. Director Webster agreed. *Id.* at 64. No one in the FBI knew that any Congressman was illegally selling his vote. And, of course, no one knew that anyone was offering a Congressman money *after* he had agreed to something for legitimate reasons.

48. The obvious possibility that a Congressman might be brought into the Abscam lair despite his complete lack of criminal intent was anticipated by some people in the Department of Justice and the FBI. Assistant Attorney General Philip Heymann met with FBI Director William Webster in approximately September 1979 and discussed the possibility. Heymann has testified that they were concerned

that nobody was being led into something by mistake and we were satisfied that the situations we were creating looked unmistakenly corrupt.

We I think after that meeting reiterated directives which go out to the prosecutors from me and the agents from Webster to just be sure that we—I think it was this clear and I think it's the way Judge Webster put it—"*Be sure that we turn away anybody if there's any ambiguity about it, if we are not sure that the guy is coming in to take hundred dollar bills for a legislative act, turn him away.*" [*United States v. Jenrette*, Cr. No. 80–289 (D.D.C., due process transcript of May 14, 1981 at 816–17) (emphasis added).]

It is obvious that Amoroso knew nothing about this precaution (*see* text accompanying note 26 *supra*). In fact he testified that his superiors gave him almost no legal or other instructions on how to conduct meetings with Congressmen. He was never instructed on the law of entrapment. *Myers* due process tr. at 3924, 4131; *Jenrette* trial tr. at 583. He did not recall discussing the elements of the crimes of bribery

deference to a defendant's rights, or out of a desire to safeguard their prosecution, the result is the same. This balance which the government itself has struck leaves me comfortable with the feeling that my decision to set aside the conviction of Kelly is based on something more than just an admittedly strong personal sense of revulsion. It is all the more comforting to know that the Department of Justice and the Bureau apparently are willing to live with this dividing line and do not regard it as a handcuff on valid police authority.

It may be that the initial rejection does not mean we have an entirely saintly public servant who does not "lust in his heart," and who is not just "being cute." Moral rectitude, fear, uncertainty, or some other reason may prompt it, but a rejection, sincere or otherwise, in the ordinary course of conduct insulates the official from corruption, and this is society's great interest.

Obviously we like to think, and we hope, that our Congressmen and Senators, and indeed all public servants, are strong enough to withstand any imaginable pressure and reject any type of temptation no matter how attractive, and walk away.

When they succumb to temptation we are disappointed and chagrined, as I was at the sight of Kelly stuffing $100 bills into his pockets. But in reality, the hard fact is that our public servants are not recruited from the seminaries and monastaries across the land and that they are plagued by the frailties of human nature.

Indeed, the Congress recognized this as a fact when it enacted the statutes (specifically mentioning Members of Congress) which make it a criminal offense for anyone to give, offer, or even promise anything of value to any public official in order to influence his official conduct and also for a public official to ask, receive or agree to receive anything of value in return for his official acts.[49] Thus, both parties to the transaction are constrained. This statute obviously was not enacted in the hope that it would be violated. It has no purpose to bring out the best there is in a person, but rather to inhibit the emergence of the worst in him, and thus protect the system. The rare instances of known breaches have been met head on by firm, vigorous prosecutions which have undoubtedly served the exemplary purpose of deterrence.

or conflict of interest. *Myers* due process tr. at 3937-39. Most astonishingly, he testified he received no instructions from his supervisor, John Good, and that he was operating freely and on his own, tr. at 1191; *Myers* due process at 3924-25; and that no one ever told him that if a public official said he did not want money for an official act he was to terminate the contact. Tr. at 1182. The only direction he got was the attorney's calls from downstairs urging him to press on.

**49.** 18 U.S.C. § 201. Bribery of public officials and witnesses.

(a) For the purpose of this section:
"public official" means Member of Congress, . . . .
(b) Whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent—
(1) to influence any official act; or
(2) to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for

the commission of any fraud, on the United States; or
(3) to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of his lawful duty.
(c) Whoever, being a public official or person selected to be a public official, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any other person or entity, in return for:
(1) being influenced in his performance of any official act; or
(2) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
(3) being induced to do or omit to do any act in violation of his official duty . . . .

.        .        .        .        .

Shall be fined no more than $20,000 or three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.

Assuming *arguendo* that public officials need even more attention from law enforcement of the type we are dealing with in this case, it should be done within the context of the purposes and efficacy of the statute. Since the statute penalizes both parties to a bribe, it is highly unlikely that anyone other than a government agent immune from prosecution for violating this statute would make repeated flagrant attempts at corrupting a Congressman for fear that the Congressman would notify the FBI. The penalty clause in the statute is a strong deterrent for such conduct. If no one except the FBI can make such persistent attempts, this procedure does not catch criminals, but creates them.

What the government attorney perceived as "being cute" may very well have been a brief victory of conscience over temptation which was a direct result of awareness of that penalty clause. I believe that in the circumstances of this case, any further pursuit and pressure on the part of government agents was nothing short of outrageous. A suspicion-free subject should be exempted from further testing on the basis of winning the first battle against temptation. He should not be required to win a prolonged war of attrition against chicanery. "Human nature is weak enough and sufficiently beset by temptations without government adding to them and generating crime." [50] If the government had no knowledge of Kelly doing anything wrong up to his rejection of illicit money, its continuing role as the third man in a fight between his conscience and temptation rises above the level of mere offensiveness to that of being "outrageous." No concept of fundamental fairness can accommodate what happened to Kelly in this case.

## IV.

I am keenly aware that the delineation of the conduct circumscribed by the due process defense is elusive. As the Third Circuit said, there is a tendency for the due process defense to overlap with the entrapment defense.[51] However, I am satisfied that this is one of the rare cases where there is a role for the court that the jury cannot and should not play. To identify that role, I return to basic principles.

■ The function of law enforcement is to prevent crime and catch criminals. Conversely, law enforcement exceeds its bounds when it manufactures crime and creates criminals. The manufacture of crime and creation of criminals have been specifically prohibited by numerous cases.[52]

■ The entrapment defense furthers this policy of preventing convictions of the "unwary innocent" [53] by inquiring first, whether the defendant was induced by the government to commit the offense, and, second, whether he was predisposed to commit it.[54] In most cases, the entrapment defense alone insures that the government does not successfully prosecute cases where it has manufactured crime or made criminals. For example, where it is not illegal to propose the commission of the criminal act, repeated urgings to commit the crime are appropriately and adequately considered within the context of the jury's inquiry as to whether those urgings constituted "inducement" and whether the defendant was predisposed to commit the crime.

In rare cases, the jury's analysis of predisposition is not alone dispositive of the question of the government's involvement in the manufacture of the crime. Trial courts have been cautioned that rather than by general rules, a determination of whether due process violations are fatal to successful prosecution shall be made on a case by case basis, depending on the particular

---

**50.** *Sherman*, 356 U.S. at 384, 78 S.Ct. at 826 (Frankfurter, J. *concurring*).

**51.** *Jannotti*, at 608; *Hampton*, 425 U.S. at 494–95, 96 S.Ct. at 1652 (Powell, J. *concurring*).

**52.** *Russell*, 411 U.S. at 434, 93 S.Ct. at 1644, quoting *Sherman*, 356 U.S. at 372, 78 S.Ct. at

820, *citing Sorrells*, 287 U.S. at 442, 53 S.Ct. at 212.

**53.** *Sherman*, 356 U.S. at 372, 78 S.Ct. at 820.

**54.** *United States v. Burkley*, 591 F.2d 903 (D.C. Cir.1978).

circumstances in each one. In discharging this obligation in the case at bar, the starting point is an examination of the statute itself—its purpose and effect. The statutory scheme precludes even the predisposed from committing the crime under real-world circumstances after the target makes one refusal. This situation contrasts sharply with the situation in *Russell* where the Court specifically noted that the government agent did not violate any federal statute.[55] Where the government's overtures to the defendant fail substantially to model real-world behavior, the results of the government conduct, while satisfying the technical elements of the bribery statute, constitute a crime which would never otherwise occur.[56] Absent the government's conduct in this case, Kelly, even if predisposed, would have had no opportunity to act upon his predisposition in the way he did. Determination that government overtures which produce such an opportunity are not fundamentally fair because they do not comply with the real-world workings of the statute is not something which the jury has been instructed to consider and must therefore be considered by the court. Due process focuses on whether "fairness has been denied an accused in light of all the circumstances." [57]

The broader focus of the due process defense—beyond inducement and predisposition to, in this case, an examination of government conduct in light of the statute allegedly violated—precludes governmental conduct which so deviates from real-world constraints that it results in a crime which would never have reached fruition but for the government's involvement. Governmental manufacture of crime in this sense is as odious, and as prejudicial to a target's rights, as is the governmental snaring of the "unwary innocent" which we term entrapment.

## V.

To reiterate, I do not believe that testing virtue is a function of law enforcement. But this personal belief aside, and assuming that it is, the method of testing must be fair. If after an illegal offer is made, the subject rejects it in any fashion, the government cannot press on. Certainly when a person recognizes the difference between the legal and the illegal, and rejects the latter, the person should be free of further testing by a device which only government agents could have the audacity to use in the face of the penalties provided for their conduct. This standard creates a workable, discernible line separating the merely offensive and the constitutionally impermissible. Crossing this line is patently outrageous. A person corrupted under circumstances which only police officials can create or by a process which only the authorities are licensed to use, has been made into a criminal by his own government.

## VI.

At the outset, defendants Weisz and Ciuzio made motions to sever on the basis of Kelly's anticipated defense. During the trial, these defendants made several motions for a mistrial and severance for reasons which were not frivolous. Each time, the court sought to repair the damage with curative instructions to the jury. But upon consideration of this circumstance, the disparity in the amount of evidence as it related to Kelly on the one hand and the defendants Weisz and Ciuzio on the other, and in light of the defendant Kelly's bizarre defense [58] and the manner in which it was put forth, I conclude that Weisz and Ciuzio

---

**55.** 411 U.S. at 430, 93 S.Ct. at 1642.

**56.** The Court in *Russell* was careful to point out that the key ingredient in the drug manufacture, which was supplied by the government, was obtainable from other sources. 411 U.S. at 431, 93 S.Ct. at 1642.

**57.** *Hampton*, 425 U.S. at 494 n.6, 96 S.Ct. at 1652 n.6 (Powell, J. *concurring*).

**58.** During the course of the trial, in an apparent attempt to escape conviction and at the same time hang on to some remnant of respectability, Congressman Kelly presented the bizarre, nearly farcical defense that he was conducting his own investigation of the reason why he had been surrounded by shady characters. He sug-

were prejudiced to the point that they should be granted a new trial.

An appropriate order will be entered.[59]

gested that he was being targeted for destruction by his political enemies who resented his independence and courage in the political arena. Not a scintilla of evidence which would support this theory ever surfaced in this case.

However, as the case unfolded, I was plagued with the unsettling realization that with this loose cannon rolling around on the deck of the criminal justice system such a thing could indeed occur. Also, I became aware that even if a victim successfully invoked the defenses of selective prosecution and/or entrapment, this would be of little solace to him, for he nevertheless has been destroyed as a voice in public affairs. This great potential for a type of mischief, which hopefully will always remain alien

to our system, standing alone, may be a compelling justification for outlawing the government's conduct against Kelly as a law enforcement procedure. If we condone such a measure, the fall-out might well be intolerable for us all.

59. Application has been made to reopen the due process hearing based on allegations contained in the affidavit of the late Mrs. Cynthia Marie Weinberg. The relevance of this material to the task before the court is not clear. In any event, in light of the disposition of this case and the reasons therefore, the motion will be denied.