UNITED STATES of America

v.

John W. JENRETTE, John R. Stowe.

Crim. No. 80–289.

United States District Court,
District of Columbia.

Aug. 4, 1983.

Reid Weingarten, Dept. of Justice, Washington, D.C., for plaintiff.

Kenneth Robinson, Washington, D.C., for defendants.

OPINION

JOHN GARRETT PENN, District Judge.

Former Congressman John W. Jenrette[1] and John R. Stowe were convicted of conspiracy (18 U.S.C. § 371) and bribery and

---

1. Jenrette represented the Sixth Congressional District of South Carolina.

aiding and abetting (18 U.S.C. § 201 and § 2). The case is now before the Court on their separate motions for judgment of acquittal or, in the alternative, for a new trial. In support of their motions, the defendants contend that (1) the actions of the government were so outrageous so as to violate the constitutional due process rights guaranteed to every citizen, (2) that the evidence established that the defendants were victims of entrapment as a matter of law, (3) that the government failed to comply with the requirements of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that the government failed to comply with certain disclosure requirements imposed by the Court. Stowe also argues that the evidence as to Count Three charging him with bribery was insufficient as a matter to law. Not surprisingly, the motions are opposed by the government.

I

This case is one of the so-called Abscam cases in which several members of the United States House of Representatives[2], one United States Senator[3] and other federal officials, state officials, lawyers and private citizens[4] were charged in different districts[5] with a variety of crimes including conspiracy, bribery, criminal gratuity (18 U.S.C. § 201(g)), interstate travel for unlawful activity (18 U.S.C. § 1952) and aiding and abetting (18 U.S.C. § 2).

There is no need for this Court to set out a detailed statement of the events leading up to Abscam since those facts are fully discussed in three other district court opinions. *See United States v. Kelly*, 539 F.Supp. 363 (D.D.C.1982), *reversed and remanded*, 228 U.S.App.D.C. 55, 707 F.2d 1460 (1983); *United States v. Myers*, 527 F.Supp. 1206 (ED N.Y.1981), *affirmed*, 692 F.2d 823 (2d Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983); *United States v. Jannotti*, 501 F.Supp. 1182, 1183 (ED Pa.1980), *affirmed*, 673 F.2d 578 (3d Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). Suffice it to say that Melvin Weinberg, a professional "con man" was convicted in the Western District of Pennsylvania on his plea of guilty to fraud in 1977. He received a sentence of probation based upon his agreement to cooperate with the Federal Bureau of Investigation (FBI) in setting up an undercover operation similar to the London Investors Ltd. "business" that he had been successfully operating before his arrest and conviction in Pittsburgh, Pennsylvania. He had been an FBI informant since the 1960's although throughout that period he continued to operate a number of cons and schemes in order to bilk and cheat various persons and citizens out of their money and goods. When Weinberg agreed to undertake the undercover operation for the FBI, he did so, not out of any change of heart or desire to go legitimate or out of loyalty to the government or the FBI or because he had reformed, but in his own words to make some big money. *See United States v. Kelly, supra*, 539 F.Supp. at 365. At first he was used in an attempt to ferret out information on stolen art work and securities, primarily certificates of deposit, but finally it was decided to have Weinberg participate in a scam in which he was passed off as the representative of Arab sheiks who wanted to enter the country. This scenario was apparently based somewhat on the plight of the Shah of Iran, the idea being that the fictitious sheiks were required to flee their country because of internal problems. To protect themselves against problems they might have in immi-

---

**2.** Michael O. Myers, Raymond F. Lederer, Frank Thompson, Jr., John M. Murphy, Richard Kelly and John W. Jenrette.

**3.** Harrison A. Williams, Jr.

**4.** Lewis C. Johanson, Angelo Errichetti, Howard L. Criden, Joseph Silvestri, Eugene Robert Ciuzio, Stanley Weisz, Alexander Feinberg, George Katz, Alexander Andrew Alexandro, Kenneth N. McDonald, Charles T. Walsh, Martin Gabey, Vincent J. Cuti, Jr., Nicholas Barbato and Bowe, Walsh and Associates.

**5.** Charges were brought in the District of Columbia, the Eastern District of New York and the Eastern District of Pennsylvania.

grating to this country, the purported sheiks, through Weinberg, and Special Agent Anthony Amoroso, posing as the president of Abdul Enterprise and as a gangster type named Tony DeVito, were to attempt to sign up as many members of Congress and government officials as possible. The Congressmen were to be promised money and the possibility of investments in their home districts and they were to be approached through middle men.

Abscam started in the spring of 1978 when a fictitious organization named Abdul Enterprises, which purportedly represented Arabs interested in investing in the United States, was formed by the FBI. Weinberg acted as the financial adviser to Abdul Enterprises, and as noted, Amoroso acted as its president. Sometime thereafter, Angelo Errichetti, then the Mayor of Camden, New Jersey, was brought into the Abscam web when it appeared that it would be necessary to bribe him in order to continue pursuing the possible illegal activities of other men. Errichetti and a Philadelphia attorney, Howard Criden, introduced the Abscam undercover agents to Congressman Michael Myers and it was there that Abscam had its true beginning. It is unnecessary for the Court to discuss the background of Abscam any further. In this case, the approach to Jenrette, was made through John Stowe, the former Congressman's friend. Stowe had apparently made his first contact with Weinberg sometime in 1978 when he and Weinberg discussed the possibility of investments in securities and how those securities could be brought into the United States. Weinberg's contacts with Stowe, and thereafter his contacts with Jenrette, followed the scenario created for Abscam.

## II

The first recorded conversation between Stowe and Weinberg took place on or about October 17, 1978. That tape is incomplete but Stowe and Weinberg briefly discussed a "business" deal during which Stowe indicated that he, Stowe, was having some difficulty and stated "as I told you my contact is a Congressman." [6] (Q 379). At one point in the conversation, Stowe mentions that he has had "a lot of dealings with my Congressman, whom I trust." Then, while laughing he stated: "He's as big a crook as I am (laughing) but, ah, no, I'm, ah I don't know who his contact is." In a second recorded conversation on October 19 or 20, 1978, it becomes clear that Weinberg and Stowe were referring to securities and bringing securities to the United States.

The next significant recorded conversation between Stowe and Weinberg [7] took place on April 18, 1979. It is clear from the tape that the entire conversation was not recorded since the first statement contained on the tape is Weinberg's question to Stowe, "A, will you have Jenrette call me alright?" In this conversation, Stowe and Weinberg were discussing a plant which makes detonators which had been out of business since the end of the Viet Nam war. (Q 381). The plant had the name of American Gear & Pinion, and throughout the months of conversation which followed between Stowe and Weinberg, and thereafter between Stowe and

---

**6.** The reference to Q 379 refers to the number assigned to the tape on which the particular conversation was recorded. Any reference to the number of the tape followed by a hyphen and then a further number, for example, Q 379–2, refers to the page of the typed transcript of the recorded conversation taken from that particular date. The tapes were received in evidence, the transcripts were not. *See* District of Columbia Criminal Jury Instructions, (3rd ed. 1978), No. 2.29. The quoted portions of the transcripts are copied verbatim from the transcripts including any errors in spelling or otherwise contained therein.

**7.** This Court is not confident that all conversations between Stowe and Weinberg, and indeed the other participants in the Abscam operation as it related to Jenrette and Stowe, were recorded, or that all portions of conversations were recorded. Moreover, as will be discussed later, there was no uniform procedure followed by the FBI for debriefing Weinberg, and the other participants, or to insure that Weinberg did not go off on his own "con" while seeking to con certain middle men at the request of the FBI in an effort to reach congressmen.

Amoroso, Stowe would continue to seek financing so that he might invest in or purchase the plant and manufacture, at first detonators to sell to foreign countries, and later, gambling equipment which might be used in the newest market for such equipment on the east coast, Atlantic City.

It then became painfully obvious that Weinberg achieved what he sought from Stowe. First, he had Stowe believing that Weinberg's Arab friends might be interested in investing in American Gear & Pinion with the possible result of a significant financial yield to Stowe. This was the carrot held in front of Stowe's nose throughout the remainder of the telephone calls between them and to the time that Abscam became public. Second, Weinberg believed that Stowe had a contact with a Congressman for that district, namely Jenrette. Throughout the many telephone conversations which followed, while Stowe continued to pursue an interest in having Weinberg and his friends invest in American Gear & Pinion, Weinberg kept bringing up the subject of "the Congressman". It was quite obvious that Weinberg had no interest in Stowe; his primary interest was in attempting to make contact with Jenrette and to present Jenrette with the possibility of accepting a bribe. Third, Weinberg concluded that Jenrette would be an easy target because American Gear & Pinion was in Jenrette's home district and Stowe was Jenrette's friend. It's quite possible that he concluded that Jenrette would be interested in bringing jobs to his home district, making his own investment, and in assisting his friend Stowe. Moreover, Weinberg was later to learn as he pursued Stowe to bring Jenrette in on the deal, that Jenrette was having financial difficulties.

Subsequent to April 18, 1979, there were eight recorded telephone conversations between Stowe and Weinberg, and throughout those conversations it was obvious that Weinberg was not interested in Stowe or American Gear & Pinion. When Stowe spoke with Weinberg on April 20, 1979, and attempted to interest him in American Gear & Pinion, Weinberg attempted to gain more information concerning Jenrette even though, assuming Weinberg was interested in American Gear & Pinion, there was no need for Jenrette to become involved. Stowe apparently never realized this. For example, on April 20, while Stowe talked about American Gear & Pinion, Weinberg went along and then, at the first opportunity asked, "all rightie. Now, did ya get 'ahold of the Congressman." (Q 382–3).

In the next recorded conversation [8] the first portion of the conversation was not recorded. Weinberg's first statement was "ya and I like to meet with the Congressman up in, ah, his property's where, in Myrtle Beach?" It was at this point that Stowe protested and advised Weinberg that he wanted to take one thing at a time and he didn't "know whether I want him [Jenrette] to get involved in this or not." (Q 344–1) Weinberg at this point backed away apparently so as not to tip his hand and advised Stowe, "well, if he wants it fine, its up to you." (Q 344–1) Of course, as noted, it is quite obvious that the target of Weinberg's "investigation" was Jenrette.

After April 25, 1979, there were recorded conversations between Weinberg and Stowe on May 2, May 13 and two on July 11. Throughout, in these conversations, Stowe continued his attempts to focus on American Gear & Pinion while Weinberg continued to seek information or some connection to Jenrette. In each of the conversations, Stowe continued to refer to his request for financial assistance to acquire American Gear & Pinion while Weinberg, though ostensibly indicating interest in the financial venture, continued to ask questions about "the Congressman." In the conversation on May 2, 1979, one which was not fully recorded, Stowe's first words were "get in touch with that American Gear & Pinion". He then stated "no that's a pretty good deal, Mel. He's got the

---

**8.** It should be noted that Stowe did not testify therefore it is not entirely clear whether all telephone conversations were recorded.

building, the machinery, the land and everything there and I know it was appraised for over a million and a quarter several years ago." (Q 345–1) Weinberg suggested that "the Congressman" call him. Finally, Stowe gave Weinberg the name of the Congressman—John Jenrette. (Q 345–(3–4)). Near the end of the conversation, Weinberg stated that he would give the Congressman a call.

Weinberg called Stowe on May 13, 1979 and again Stowe sought to gain his interest in American Gear & Pinion. Weinberg, seeking to continue Stowe on the string, and misleading him, stated that he was up at the plant "with my appraiser and take, stop and look at the plant." (Q 346–1) Later in the conversation Weinberg notes that he would also like to speak to Stowe about "the, on the ah, Congressman's land." (Q 346–21) At this point in the conversation, Weinberg refers for the first time to "Tony DeVito" the "new Chairman of the Board." (Q 346–2) Then he suggested to Stowe that "we will bring you and the Congressman down, all right, we'll send our plane, we'll fly you down commercial and we'll meet you on the yacht and we can go over everything." (Q 346–3).

In a recorded conversation on July 11, 1979, Stowe called Weinberg and advised that "everything's set up with the gentleman in Washington." (Q 347–1) At the end of the conversation, Weinberg stated, "and the Congressman's all set up huh?" (Q 347–4).

Weinberg, who views himself as a master con man, at one point testified that he thought Stowe was a con man or that Stowe was trying to con him. The tapes demonstrate that Stowe, rather than being a con man, was naive, and at times, somewhat pathetic. During a conversation with Weinberg on September 9, Weinberg stated that "we just not got enough help." (Q 383–2). Stowe immediately asked "how about a job Mel?" Weinberg, apparently

taken by surprise, asked Stowe to repeat the question and Stowe, obviously dead serious asked, "how about a job?" Weinberg responded, "well, I'll tell ya, send me a resume, they are gonna be hiring soon." Stowe answered that he did not have any up-to-date resumes and Weinberg advised him to make one up and send it to him. Near the end of the conversation, Weinberg again brought up the Congressman noting "and maybe we could do something for him." (Q 383–7)

The next critical conversation between Weinberg and Stowe took place on November 15, 1979, *after* John Good, the agent in charge, and Amoroso (usually referred to throughout as Tony DeVito) decided to propose a bribe to Jenrette. The Agent's call was made from a hotel suite in Atlantic City and was unrecorded, even though the call was made in the presence of FBI agents. The agent testified that they were afraid to bring recording devices into the hotel suite but records later uncovered by Jenrette's counsel during the trial revealed that at least one, rather expensive recording device, was in the room at about the time the call was made.[9] The conversations leading to the making of the call also raise a number of questions. Clearly the decision to offer a bribe to Jenrette was instigated and made by Weinberg, not John Good, agent in charge, or Anthony Amoroso, the agent assigned to work with Weinberg. *See* Part IV C, *infra.*

The next call was made on November 27, 1979, to set up a meeting with the Congressman; this call apparently being the result of the unrecorded conversation on November 15. Again, Stowe asked for a loan and Weinberg promised to "talk about it." (Q 384–3). Weinberg promised to introduce Stowe to Tony DeVito. He stated that he would bring "Mr. DeVito with me" and then cautioned Stowe "just to introduce ya to him so when ya come Tuesday with the, ah Congressman, don't look like

---

**9.** One must wonder why for such an important call, the agents did not make arrangements to record the call, or if the call could not be recorded from the hotel suite for the reasons stated by the agents, why the call was not made from another location on that day or another day. There appears to be nothing significant about November 15, 1979.

ya just met him [DeVito]. Ya follow me?" (Q 384–4) [10]

On December 4, 1979, there was a partially recorded telephone conversation between Stowe and Weinberg. The purpose was to finalize the planned meeting between Stowe, Jenrette, DeVito and Weinberg at the Abscam townhouse located at 4407 W Street, N.W. in the District of Columbia. Weinberg briefly explained that they would like the Congressman to help them bring the Sheik and his friends into the country. Weinberg stressed to Stowe that DeVito "is" a "tough guy", "so this is what he wants but you gotta remember one thing now Tony's [DeVito] a tough guy. He's gotta his yaknom tell us he's [Jenrette] gonna do it." (Q 127–3) Stowe notes that he wants "no recordings or anything" and Weinberg assures him that the townhouse is safe. (Q 127–3) [11]

The next recorded conversation was between Stowe, Jenrette, Weinberg and DeVito and took place at 4407 W Street, N.W. in Washington, D.C. and was recorded by video tape. (Q 132). It was during this meeting that DeVito offered a bribe to Jenrette in exchange for Jenrette using his official influence to assist a number of persons to enter the country. When DeVito asked what Jenrette could do for him, Jenrette stalled and sought time to study the situation, purportedly to be sure that he could do what he promised. Jenrette also noted his financial problems and sought financial assistance. [Q 132–17] They discussed how a payment to Jenrette could be made and Jenrette noted at one point that he wanted his law partner there at the house "just to further cover my ass." (Q 132–28). They also discussed the financing of Stowe's project (American Gear & Pinion) in South Carolina. (Q 132–29) Jenrette notes later on that "John's

[Stowe] gonna probably be expecting, gonna be expecting something". (Q 132–30) [12]

It is clear that during the December 4 meeting Jenrette understood that he was being offered a bribe. He notes at one point that, "I dunno a thing. I don't know that I've taken a bribe and I dunno know that that you've offered me a bribe." (Q 132–31) He immediately stated however that he would feel "more at comfort if I could come back tomorrow and say OK." (Q 132–31). In that meeting he advised the group that he was under investigation by the Justice Department and that Edward Bennett Williams was his attorney. He also stated later on, "ya, and I'd like to have your money. Don't get me wrong. I'd like to do it, I'd like to help you." (Q 132–34) As if to set aside any doubt as to his state of mind, Jenrette advised DeVito "are we clear, I mean I, well listen, don't get me wrong, I don't I—. . . I got larceny in my blood. I'd take it [the money] in a goddamn minute." (Q 132–39) Jenrette did not accept the bribe at that point but left the townhouse to think it over, the impression being that he wanted to make sure he could produce on his promise.

Stowe called the townhouse on December 5 and spoke with DeVito. He expressed the desire to start up to the townhouse at that time, presumably to pick up the money. However, DeVito stated, "Hey, listen for that kind of money we can all wait a little bit." (Q 143–1) DeVito's reluctance at that point resulted from the fact that Jenrette had not advised Stowe or DeVito that he would accept the money.

A few minutes thereafter, Jenrette called DeVito and advised him he was tied up and that he would stop by the townhouse after having dinner with the President and his family at the White House. [13] He then said

---

10. Weinberg has been accused of putting words in the mouths of some of the Abscam participants.

11. At this point it seems obvious that Stowe realizes there may be a discussion about a criminal act.

12. It appears that Jenrette is advising DeVito that Stowe would probably want a portion of any money paid to him.

13. It isn't clear whether Jenrette actually had a dinner engagement or whether he was merely attempting to impress DeVito.

that he would stop at the townhouse in the morning. DeVito rejected that suggestion and asked Jenrette to meet him after dinner. Jenrette indicated that he could not get there until after 10:00 and DeVito advised him that that was agreeable.[14] (Q 144–2). Finally, DeVito relented and told Jenrette to come over that evening if possible, and if not possible, to come over the next morning.[15] During the conversation, Jenrette and DeVito discussed the possibility of Stowe receiving a share. Thereafter, Jenrette expressed some concern over his ability to perform on the agreement. DeVito noted that "like I told you last night. I'd have known if you were [misleading] me if you told me definitely it could be done." (Q 144–4).

Jenrette again expressed concern over being able to produce on his promise and the following colloquy occurred:

Jenrette: All right, if I come, I'll do what I said. I mean that part will be done. I'll steer it, but now you guys come and and for the same reason I don't produce. I uh understand that you understand what I'm saying.

DeVito: Right.

Jenrette: But, are they going to? There I don't want.

DeVito: Their problem is not with you, their problem is with me.

Jenrette: All right, I don't want any, you know.

14. The jury in listening to the tape could certainly infer, taking into consideration Jenrette's comments at the townhouse on December 4 (Q 132), that Jenrette rather than having second thoughts about accepting any bribe, was really trying to find a way to have Stowe pick up the money. Naturally, DeVito was just as anxious to have Jenrette pick up the money in person in the open eye of the video camera.

15. Obviously, DeVito's primary concern was to get Jenrette to accept the bribe, preferably on camera, thus by giving him the option of stopping by the townhouse that evening or the next morning, he felt it was likely that Jenrette would personally pick up the money.

16. Presumably, Jenrette was saying that he wanted a clear understanding that he would do everything to perform on the agreement and that he did not want to end up in a river in cement if, regardless of his best efforts, he was unable to perform. Although the government

DeVito: John, like I said.

Jenrette: I don't, I don't like cement.[16] (Q 144–(4–5)). DeVito assured Jenrette that if Jenrette failed to perform, the problem would be DeVito's, not Jenrette's. (Q 144–5) It was finally agreed that DeVito would wait to hear further from Jenrette.

Yet later the same day, Stowe called DeVito and indicated that Jenrette had advised him that Stowe could pick him (Jenrette) up the next afternoon and that they would go to the townhouse. (Q 145–1) Stowe called DeVito the next morning to say that he was waiting for further instructions from Jenrette. (Q 155)

Finally, on the afternoon of December 6, Jenrette called DeVito and noted that Stowe was there in Jenrette's office with him. After indicating that it would be difficult for him to meet with DeVito, Jenrette asked whether Stowe could meet with DeVito. DeVito, obviously disturbed that he would not get Jenrette on camera, complained to Jenrette that he felt he (DeVito) was not trusted by Jenrette. (Q 156–3) Jenrette noted that he had an agreement with DeVito and that "I'm gonna fulfill my obligations." (Q 156–3)[17] Perhaps giving his true intention away, Jenrette further stated "that keeps me just a little bit ah one step away from a section in the code about, uh, public officials."[18] He noted

does not admit it, it is clear that there was a deliberate attempt to depict DeVito as a member of organized crime. Weinberg had already told Stowe that "you gotta remember one thing now, Tony [DeVito] is a tough guy" which indicated that Jenrette was clearly to tell them whether he was going to do it, referring to arranging to bring the Sheik or his family into the country. (Q 127–3) Indeed this statement of Jenrette's purported fear of DeVito, was the basis for Jenrette's request for an instruction on duress and coercion. *See* District of Columbia Criminal Jury Instructions (3d ed. 1978) No. 5.04. That request was denied.

17. Here Jenrette apparently refers to his obligation to assist the Sheik to enter the country.

18. Apparently a reference to the United States Code.

that "we've got those ethic rules about the amount ah money that we can make." (Q 156–3)

DeVito then stated that "you're looking for, uh, insulation, uh, ah ... along that line, any you want him to pick up the money and whatnot (laugh). All right— what time's he gonna come over?" (Q 156–4) Jenrette noted that Stowe was sitting with him right then, and then announced that he was required to leave his office to go on the House floor and that Stowe would speak with DeVito while Jenrette was on the floor.[19] (156–5) Stowe and DeVito then made arrangements for Stowe to come down to the townhouse and pick up the money.

Stowe is thereafter recorded on a video tape accepting a $50,000 bribe on behalf of Jenrette (Q 158). When Weinberg asked Stowe "what is with that guy" referring to Jenrette's reluctance to come down to the townhouse, Stowe states that Jenrette is "scared", and that, "he'll do what he says, but he's gonna protect himself." (Q 158–2) Once the money is counted out and handed to Stowe, Stowe again mentions American Gear & Pinion. (Q 158–4) Weinberg promises that they will work out the terms of an agreement.

Later, after Stowe had returned to Jenrette's office with the money, Jenrette called DeVito and acknowledged during the conversation that Stowe was with him at that time. DeVito asked whether he had received "the package" from Stowe and Jenrette responded, "everything's fine. I'll do my share of the work and I'll need to do is er the names and where and so I can start making some background preparations." (Q 156A–3)

Although the bribe had been given to Jenrette, the calls between Stowe and Weinberg did not cease. Stowe continued to prod Weinberg about financing for American Gear & Pinion. There are eight recorded conversations between Stowe and Weinberg between December 6, 1979 and

January 7, 1980, during which Stowe continued to press the subject of the plant in South Carolina. On January 7, DeVito, Weinberg, Stowe and Jenrette again met at the townhouse and discussed financing for American Gear & Pinion. Again much of the conversation concerned that plant but during the course of the conversation Jenrette suggested that a United States Senator could probably be brought into contact with DeVito and Weinberg and that subject was discussed in several subsequent conversations. The last recorded conversation between the participants was on January 29, 1980. On February 2, 1980, the Abscam story broke and Stowe and Jenrette were arrested.

### III

In moving for judgment of acquittal, or lieu thereof, a new trial, the defendants complain of violations of law allegedly perpetrated by the government prior to their indictment and during the trial. First they contend that the government violated their rights of fundamental fairness in general by the methods used by the Federal Bureau of Investigation (FBI), and in particular, by the manner in which they were selected and pursued by the FBI. They contend that the action by the government agents, and their paid con man, Weinberg, amounted to over involvement by the agents and that such conduct was outrageous. *See Hampton v. United States*, 425 U.S. 484, 493–494, 96 S.Ct. 1646, 1651– 1652, 48 L.Ed.2d 113 (1976) (Powell, J. concurring); *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978); *United States v. Archer*, 486 F.2d 670 (2d Cir.1973). Second, they complain that there was entrapment as a matter of law in that they were induced to commit the offenses by government agents and that there was no predisposition to do so on their part. Third, they complain that the government failed to comply with dis-

---

**19.** The fact that Jenrette was discussing the acceptance of a bribe at the same time he was performing his official functions in the Con-

gress of the United States was probably not lost on the jury.

The file afforded little assistance to the Court.

scam program was "doing a favor" for the agents in South Carolina when they included Jenrette in the Abscam investigation. Since it was felt that that information might be relevant, the Court entered an order requiring the government to produce all the materials turned over to the news service, and in addition thereto, to produce any other related material which may have been redacted or not turned over to the news service. The FBI presented only the materials turned over to the news service. That material was presented to the Court in late January 1983 or early February 1983, together with an undated cover letter from the Department of Justice.

## IV

Prior to addressing the specific arguments made by the defendants, the Court finds it necessary to briefly set forth its comments related to general criticisms leveled at the Abscam operation by the defendants; criticisms which have also been raised and discussed in other Abscam cases. Of course, while there is a tendency to group all of the so-called Abscam cases together; each case must be judged upon its own peculiar facts. While some of the same agents were involved in all cases, different issues are raised in each case.

### A. Selection of the Targets.

. It is not entirely clear how Jenrette was selected as a target of the investigation in this case. It is known that, as Jenrette stated on December 4, 1979, at the W Street townhouse, he had been under investigation in his South Carolina Congressional District as the result of certain land dealings in that state. A friend or friends of Jenrette had also been investigated and at least one had been convicted. Notwithstanding that background, the government had steadfastly contended that the targeting of Jenrette in Abscam had nothing to do with the South Carolina matters. Simply stated, the government contends that it threw the Abscam net into the political waters populated by members of the federal legislature, and Jenrette, through Stowe,

was caught. Counsel for Jenrette was persistent in attempting to show some connection between the two investigations. Finally, counsel was able to have produced telegrams dated in May 1979 and November 1979 which suggests that the Abscam operatives were aware or should have been aware of the South Carolina investigation relating to Jenrette.

Unfortunately for all parties, it is not entirely clear how Weinberg first became involved with Stowe; part of the problem being that portions of conversations between Stowe and Weinberg were not recorded. Moreover, the Court is not confident that Weinberg recorded all of the conversations he had with persons connected with Abscam. In any event, the record is clear that Weinberg's interest, and presumably that of the FBI, was not Stowe, but any government official known to Stowe and quite possibly the interest was specifically related to John Jenrette. It is doubtful that Weinberg would have pursued his relationship with Stowe, but for the fact that he felt that Stowe could lead him to a government official, and possibly Jenrette. Once Stowe mentioned a Congressman, Weinberg cultivated Stowe's friendship to gain a meeting with the Congressman.

Since the government contends that there was no connection between the South Carolina case and Abscam, and since there was no clear evidence to the contrary, it appears that the FBI decided to present a bribe to Jenrette without any evidence or indication that he was predisposed to accept the bribe. Even though it now appears from records obtained by the defendants that the Abscam officials were aware or should have been aware of the investigation of Jenrette in South Carolina, the government states, and the Court accepts, that the investigation against Jenrette was not initiated as the result of the South Carolina affair. Thus, in pursuing Jenrette for a period of at least seven months, and possibly more, the FBI did so without probable cause, or indeed without even a reasonable suspicion that he could be induced to accept the bribe. Certainly, the fact

that he was a Congressman gave rise to no such suspicion, nor did anything else known to the government at that time.[23] Thus, without any suspicion that Jenrette had ever taken a bribe, or engaged in any illegal activity, the offering of a bribe to Jenrette in December 1979, and the decision to offer the bribe in November 1979, amounted to no more than a test, a test which could have been given to any member of Congress, any government official, or indeed any citizen.

Stowe was no more than the means to the end, the means to reach a government official and seek to have him accept a bribe. Obviously, the FBI had no particular interest in Stowe except that he might have a connection with a government official, not necessarily a corrupt government official, but one who might be corrupted by Abscam. While it may be that that was not the original intention of the FBI, or indeed the intention of the agents, it seems clear that, Weinberg felt no such restraints, and as will be demonstrated, the ultimate decision to go forward and attempt to involve Jenrette in bribery was based, not on a careful analysis and review of any written records or the tape recordings made during the course of conversations with Stowe but on the intuition or feeling of Melvin Weinberg, a convicted con man. The decision becomes even more questionable when it is recalled that Weinberg financially benefited from each government official he brought in.

The question presented under these facts then is whether the total conduct of the government was outrageous and whether it violated any rights of Stowe and Jenrette, or their rights to fundamental fairness, thus making it necessary to vacate their conviction.

B. The Issue of Entrapment.

Another issue which is necessarily presented in this case, but need only be briefly addressed by the Court, is the amount of the bribe offered, and whether, standing alone, that amount was so great as to establish entrapment as a matter of law.

No one can seriously dispute that entrapment was properly raised as a defense in this case. There was not a scintilla of evidence that either Jenrette or Stowe sought out a bribe. Throughout the year or more in which Stowe had numerous discussions with Weinberg, there was no evidence that he was seeking to be a part of a criminal venture. His personal interest, naive though it may have been, was to obtain legitimate financial backing to go into business, hopefully with American Gear & Pinion. It is also clear that he had no intention of bringing any government officials into any illegal act; that was a matter that was pursued solely by Weinberg. The same can be said for Jenrette. There was no evidence that he had ever accepted a bribe, or had engaged in any illegal activity. As noted, while Jenrette had been investigated in South Carolina, the agents in the Abscam operation claimed not to have had that information and therefore that information cannot form the basis for their investigation. Thus, it is clear that the government through Weinberg and DeVito (Anthony Amoroso), then operating as an undercover agent, planted the seed of corruption in this case. Obviously entrapment was a legitimate defense.

> " '[E]ntrapment' means that law enforcement officials, acting either directly or through an agent, induced or persuaded an otherwise unwilling person to commit an unlawful act. On the other hand where a person is predisposed to commit an offense, that is, ready and willing to violate the law, the fact that the government officials or their agents merely afford opportunities for him to do so does not constitute entrapment."

District of Columbia Criminal Jury Instructions (3d ed. 1978), No. 5.05.

---

**23.** It must be remembered that although Jenrette had been investigated in South Carolina prior to Abscam, the Abscam officials claimed to have had no such information, so that, for all intents and purposes, Jenrette's slate was clean.

Indeed, the actions of the law enforcement officials "may take many forms including persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need." *Id.* There is nothing legally wrong with government agents using decoys or undercover agents "in order to apprehend persons *engaged* in criminal activities, provided that they merely afford opportunities or facilities for the commission of the offense[s] by one already predisposed to commit it." *Id,* (emphasis added). If the jury finds no inducement, then there is no entrapment. If, however, a jury finds that a defendant was induced to commit a crime, the jury must then determine whether or not the defendant was predisposed to commit the offense. "The defendant's predisposition or willingness to commit the crime charged may be shown by evidence of his prior conduct of a similar character or by evidence, direct or circumstantial, that he was ready to engage in illegal conduct in question." *Id.*

The record in this case was certainly sufficient to support a finding by the jury that the government induced the defendants to commit the offense; indeed, inducement was the function of Weinberg. In the case of Jenrette, the government agents sought him out, induced him to go to the W Street townhouse and offered him a bribe. Moreover, when he hesitated to take the bribe pending further "research" on his part, the agents continued to urge him to take the money. The bribe was actually offered on December 4, 1979, but Jenrette, after some stalling, did not accept it until December 6 when Stowe hand carried it from DeVito to Jenrette.

On these facts, the jury could find inducement by the government but they could also find predisposition on the part of Jenrette. While he hesitated to take the bribe, there was evidence on which they could find that the hesitation was caused, not by a moral revulsion to a bribe offer, but by his desire to cover himself. He stated that he did not want to take the money without feeling "comfortable about being able to do it [perform the services requested by DeVito]." (Q 132–27). Then he went on to say that "If I take it I'm gonna take it as a, or have a lawyer" (Q 132–27) as if to further explain, he immediately thereafter stated that he would get his law partner there "just to further cover my ass—that he's taking it [the bribe] as a legal fee." (Q 132–28). Moreover, there was no question that Jenrette looked upon the money as a bribe because he specifically referred to it as such. (Q 132–31)

Viewing the video tape of the December 4 meeting on W Street, one could not help but hope that Jenrette was in fact trying to buy time to get away from the W Street townhouse to either report the attempted bribe to appropriate authorities, such as the FBI, or to back away completely from any contact with the Abscam undercover agents. Unfortunately, he did not do so; rather, he accepted the bribe on December 6.

After listening to and viewing the entire tapes, the jury could find that Jenrette, although induced to accept the bribe by the government, was predisposed to commit the crime. Certainly, the conversations on the tapes suggested that Jenrette knew the reason for going to the W Street house. Thus, viewing the totality of the circumstances, there was sufficient evidence that Jenrette was predisposed to commit the crimes of which he was convicted.

The case involving Stowe is somewhat different. Weinberg began to cultivate Stowe as early as October 1978 and continued to pursue him until January of 1980. While Stowe was not the principal target, he nevertheless accepted a part of the bribe money, and if he did not receive the money, he was clearly a part of the conspiracy. But while Jenrette was not approached until late November or early December 1979, Stowe had been approached over a year before. Moreover, the inducement to Stowe was different. Stowe wanted legitimate financing for a business operation and for over a year Weinberg, using the tools of his trade, continued to string Stowe along until Stowe finally ended up

inside the W Street townhouse. Stowe was not after the $50,000 bribe, but a legitimate involvement in American Gear & Pinion or a similar prospect. The Court finds much less evidence of predisposition on the part of Stowe than on the part of Jenrette.

■ As to the amount of the inducement, it was $50,000 with the possibility of an additional $50,000. Although he does not press the point, there simply is no support for an argument that the amount of the bribe was so great so as to constitute entrapment as a matter of law. Certainly $50,000 or $100,000 or double that amount, would not be so large as to excuse a member of Congress who has accepted a bribe.

### C. Control Over Weinberg.

One criticism of the Abscam operation was that the FBI did not closely monitor the agents and gave too much freedom to Weinberg. The Court finds this criticism is supported, in part, by the facts.

First it was clear that Weinberg, a convicted con man, would be difficult to contain and that his activities required constant monitoring. He had made a deal with the FBI under which his success in the government sponsored sting or con activities could benefit him financially as well as allow him to remain on probation. It seems that the more successful he was, the longer his involvement in the operation would last, and the greater the financial award he would receive. In a way, he was little more than a modern day bounty hunter. To call him an informer is misleading because he did not *inform* on Stowe or Jenrette, he *induced* them to do certain acts. Near the end of the Abscam operation, Weinberg was making more than many of the supporting agents, and perhaps more than the Attorney General and the Director of the FBI. He was able to make more money by being successful and being successful meant delivering government officials to Abscam. This set of facts would raise questions of Weinberg had he been a mere informer; but Weinberg was a professional con man, one trained in the art of persuading people to do what they either did not intend to do, or did not want to do. And, his criminal record reveals he had been successful in his chosen field. Indeed, the Abscam operation was patterned after a former Weinberg scheme which had been successful. All of these factors raised a red flag concerning the use of Weinberg in the operation.

Second, there was the obvious danger that Weinberg, who gained an introduction to government officials through the FBI agents, would attempt to operate his own confidence game, in lieu of, or in addition to Abscam. There is evidence in this case that Weinberg had accepted money from Stowe but had never reported that to the FBI, and there were allegations of other "gifts" to him. Moreover, one of Weinberg's colleagues, also a convicted con man, by the name of Melcher, who also worked for Abscam, did yield to temptation and attempted to operate a con game within Abscam.

Third, one would hope that there was concern over the possibility that Weinberg, having been introduced to government officials through the FBI, might attempt to corrupt them, or perhaps, since he was taping telephone conversations, save some of those tapes for use in the future. It is not difficult to imagine that a taped conversation, although not containing any discussion of bribery or any other criminal act, might nevertheless, either in context, or taken out of context, prove very embarrassing for an otherwise innocent individual.

There were many other disquieting facts brought out during the trial which raised a suggestion that Weinberg was not as reliable or trustworthy as the FBI would have the Court believe. Nevertheless, there appeared to be no real effort to assert greater control over him and there was a tendency to accept his word without any support.

One example of the problem was that Weinberg had no specific instructions on recording telephone conversations and there was no systematic means of debrief-

ing him once he had made a telephone call. All of the calls were not made in the presence of FBI agents. Thus, when a telephone conversation was not taped, or was only partially taped, Amoroso and Good were at the mercy of Weinberg's memory as to who he had spoken to and the contents of the conversation. During the trial, Weinberg proffered that his memory was not always that good. Consider the following questions posed by the Court, and the answers given by Anthony Amoroso, the agent who was the direct supervisor of Weinberg. The Court was questioning Mr. Amoroso concerning Weinberg's introduction to other persons.

THE COURT: How did you determine that?

AMOROSO: By the conversation with Mr. Good.

Q. I see.

Now, as I understand it then on one of these telephone conversations that we have been hearing about Mr. Good ... Mr. Weinberg would make the call. Was he required at that point to report directly to you?

A. He would either get in touch with me or Mr. Good.

Q. Within what period of time? Did he have any specific directions?

A. No, as to what period of time?

Q. Yes.

A. No.

Q. A day? A week? A month?

A. Well, he usually contacted us, you know, within every couple of days.

Q. And he had no specific directions?

A. No.

Q. He could have contacted you or not contacted you?

A. If he wouldn't have contacted us within a couple of days, we would get back to him.

Q. If you knew the call had been made?

A. If I knew the—

Q. If you knew that Mr. Weinberg had done something—

A. Well, I was constantly keeping in touch with him. So was Mr. Good, tele-

phonically because, you know, in situations like that you always keep in touch with him.

Now I think what you are saying did I know that he had made a call?

Q. Yes.

A. Or not.

Q. You did not know, did you?

A. Unless he told me.

Q. So you had to rely strictly upon his word?

A. Correct.

Q. And he was not required by you or Mr. Good, if you know about Mr. Good, to report telephone calls made?

A. Not by me. I don't know about Mr. Good, Your Honor.

Trial Transcript, September 12, 1980, 913–915.

The fact that there was no uniform procedure for debriefing Weinberg, and the possible problems such a lax procedure could raise, was made clear by the now famous case of the missing tapes. At one point, Weinberg advised the agents that someone had stolen tapes and cigars from his bag at an airport. The bag also contained a tape recorder. He stated that no other items of value had been stolen. The fact that the tapes were stolen however did not raise any great concern with the government agents even though Weinberg could not recall the contents of the conversation or with whom he spoke. During a post trial hearing, the Court questioned Mr. Good about the lost tapes.

"THE COURT: My question is: Once that [the missing tapes] was reported to you by Mr. Weinberg what action did you take, if any?

"MR. GOOD: Well, I instructed that the agents at both the JFK RA, which covered LeGuardia Airport also, contact the appropriate people at the airlines there and also a phone call was made to the West Palm Beach resident agency where the agents there contacted the personnel at the airlines there, and I also notified F.B.I. Headquarters, Mike Wilson.

"Q. What did you learn as a result of your investigation?

"A. The contacts at both airports proved to be negative.

"Q. Now, Mr. Good, so you did not recover the tapes?

"A. No, we did not.

"Q. But you are—are you satisfied the tapes are in fact missing?

"A. That is correct.

"Q. Those three tapes?

"A. Yes, your Honor.

"Q. Did you ever hear a report that the tapes were more than three, something like 16 or 19?

"A. I heard that from people who really had no connection with the case, primarily from people over in Newark who were saying that there were 16 tapes or more missing, but not from anybody that was directly associated with the incident.[24]

"Q. When you refer to the people in Newark, are you referring to Mr. Plaza and Mr. Weir?[25]

"A. I would think it originated with them, or from somebody that was associated with them....

"Q. Did you—and I may have asked this question before, Mr. Good. If I have already asked the question, why I apologize to you. Did you make any effort to debrief Mr. Weinberg concerning the contents of the tapes?

"A. I, personally, didn't, but one of the other agents did, and they informed me that he couldn't recall exactly what was on those tapes. He felt that they were tapes that were not of much consequence, because if they were he would have called us and notified us what was on the tapes prior to his even coming up, and—

"Q. How soon after the tapes were stolen did this agent attempt to debrief him?

"A. It would have been the same day.

"Q. Then I am just a little bit confused. You say that Mr. Weinberg said that they were not of great importance?

"A. He couldn't recall the substance of any of the conversations. He didn't recall having taped any calls during that particular time frame that were tremendously meaningful, or he would have called us immediately, or reported to us immediately what was on those tapes.

"Q. But the agent spoke to him, I think you said within a day?

"A. Yes, that is correct. But these tapes would have been made during a prior week or two before he came from Florida to New York.

"Q. Well, I am still not sure I am following you. Are you saying if the tapes had been particularly meaningful he would have called you at the time the tapes were made?

"A. At the time the tapes were made, I think on occasions in the past, for example if they got a phone call immediately prior to the date of a pay off or a few days prior to the date of a pay off where there was a very meaningful conversation he would call us immediately and in many cases we sent somebody out to pick up that tape and fly it to Washington, or to Brooklyn, or to whoever was making the decision as far as the case was going to proceed.

"Q. During this particular taping session or whatever it was involving the tapes that were subsequently lost, was there an agent with Mr. Weinberg?

"A. I don't believe so. It would have been an agent who would have been available to him had he had need for one. There wouldn't be one staying with him at his house at that time.

"Q. Who would have made the determination that these tapes were of importance or significance, Mr. Weinberg?

---

24. The only person directly associated with the incident was, of course, Melvin Weinberg.

25. Mr. Plaza and Mr. Weir were Assistant United States Attorneys in the District of New Jersey.

"A. No. It would have been in the course of our conversations with him.[26]

"Q. You wouldn't know that unless he called you.

"A. We would talk to him every day.[27]

"Q. But he did not mention these tapes?

"A. No, he didn't. He would mention so and so might have called, but nothing of any consequence.[28] Sometimes he would get calls that he wouldn't go into any details with us about, particularly at that period of time, because it was in the last phase of the investigation and we were concentrating on things he really wasn't involved in at that time, primarily the Philadelphia situation.[29]

"Q. Well, when he made these calls would he speak with you or Mr. Amoroso or someone else?

"A. It would have been either Amoroso or myself, or it could have been one or the other agents. It would have been dependent upon where we were, what we were doing. During that period of time I was in Philadelphia so it would have been unlikely that he spoke with me. He may have spoken to Bruce Brady or someone of the other agents who was there in Havppague at the time.

"Q. Did you, personally, discuss this matter with Mr. Brady?

"A. As far as—

"Q. What was on the tapes?

"A. What was on the tapes? I may have, but I don't recall, specifically, Your Honor at this time.

"Q. To your knowledge did Mr. Brady or yourself or Mr. Amoroso or whichever agent Mr. Weinberg may have contacted, did any of you at the same time you received these telephone calls make any notes concerning the contents of the call and the contents of the tape?

"A. Not to my knowledge.

"Q. How did you keep track of, I think I may have asked you this before, but with all of these investigations going on—Mr. Weinberg somewhat off on his own making a variety of calls, how did you keep track of what to expect from Mr. Weinberg in the way of tapes?

"A. Well, during the course of the investigation when we were traveling together, which was a good portion of the time with the cases, those tapes would be immediately taken into the custody of an agent, usually Agent Brady or Agent Bursey would assume custody of those tapes immediately upon the phone call having been made, or the taping having taken place." [30] Hearing Transcript, May 14, 1981, 858–863.

But, of course, Amoroso told the Court that Weinberg did not have specific instructions on what to report. Moreover, Good's testimony indicates that the agents should have had a concern over Weinberg's activities and his memory, since he could not remember the substance of the conversa-

26. Obviously, Weinberg made the determination whether the call was important or significant. If he did not tape a conversation, he did not call the agents.

27. This also raises questions. If the agent would speak with Weinberg every day, why would not Weinberg brief the agent on all calls that he had made even those calls which may have been insignificant? Seemingly, he would have at least indicated that an insignificant call was made to a particular individual. It would also seem that the FBI would have required Weinberg to keep a log of any and all calls involving Abscam.

28. Of course, here apparently Weinberg did not mention that "so and so might have called" because Weinberg could not remember who did

call and the FBI had no record of who may have called Weinberg during that two week period. This makes quite clear that it was Weinberg who was making the determination of the importance or significance of the tapes, not Mr. Good or Mr. Amoroso or the FBI.

29. If Weinberg wasn't involved at this point, why was he making calls?

30. This was, of course, dependent upon Weinberg advising the FBI that a telephone call had been made. In addition, it is quite obvious that this procedure was not utilized at all times, because Mr. Good himself stated that "these tapes would have been made during a prior week or two before he came from Florida to New York. (Hearing Transcript May 14, 1981, 863.)

tion, or even who he had spoken to, although at one point Good had indicated that Weinberg was debriefed by the agents on the day he reported the tapes stolen.

In addition, the issue of the missing tapes did not necessarily implicate Weinberg in any wrongdoing. The tapes and the cigars may have been stolen, or they may have been lost, but certainly the incident raised questions concerning the reliability of Weinberg. First, was he telling the truth, had the tapes actually been stolen? This raises other questions including why were Abscam tapes in Weinberg's possession and in an unlocked bag. If he had been debriefed the same day he reported the tapes missing and could not remember the substance of the conversations or who he had spoken to, presumably, the calls had been made some time ago. In fact, Agent Good testified that the calls may have been made a week or two prior thereto. Second, why would someone steal blank tapes and cigars and nothing else of value? Certainly the cigars had no value, and the tapes had little value; unless the person who stole the tapes knew of the contents of the tapes. If this was the case, that raises the question whether someone had breached Abscam's security, a matter which would seemingly be of concern to the government. Third, if the tapes were stolen by someone seeking more than blank cassette tapes, who was recorded on the tapes. Weinberg professes not to know. Could those tapes thereafter be used to slander or libel an innocent citizen and in that regard, what would be the responsibility or the liability of the government. Fourth, why wasn't Weinberg required to keep a log of his calls—and why wasn't he required to report *every* call to the FBI, whether significant or insignificant. The agents and Weinberg testified that he had never been briefed on the issue of entrapment and Weinberg was not a lawyer nor a sworn officer of the United States. Yet it is clear that he was entrusted with maintaining security over tapes which could be extremely sensitive.

The quoted portions of the record and the testimony of Agents Amoroso and Good indicate that the control over Weinberg was less than stringent, this being so even though Weinberg was a convicted con man with an extremely questionable background, and even though one other con man, Melcher, had attempted to use Abscam for his own purposes. The record further reveals that not only was there a lack of control over Weinberg, but that he made decisions which should only have been made by officers of the United States, a fact indirectly admitted by the agents. At one of the several post trial hearing in this case, the Court asked the following questions of Special Agent Good, the agent in charge.

"THE COURT: Did you know that Mr. Stowe was interested in a financing program for American Gear & Pinion?

"MR. GOOD: I became aware of that, yes, I did.

"Q. When did you become aware of that?

"A. It would have been in November after the 15th.[31]

"Q. But you were not aware of that before that date?

"A. I was aware that he was interested in financing, in obtaining financing for a number of different things. I don't believe I knew that Gear & Pinion was mentioned before that, but it may have been.

"Q. What sort of reports did you receive concerning Mr. Stowe from Mr. Weinberg? How was he described?

"A. He described him, as he said, a con man.

"Q. He described Mr. Stowe as a con man?

"A. Yeah.

"Q. Did Mr. Weinberg refer to any other cons that Mr. Stowe may have been involved in?

"A. No, he didn't.

---

**31.** The 15th is significant because that is the date that Weinberg made an unrecorded call to Stowe in order to set up the actual contact with Congressman Jenrette.

"Q. What specifically was he referring to when he said "con man"?

"A. Well, I guess from the way he conducted himself, how he was looking to get money; he suspected him of some kind of devious motive because of the way he dealt, basing it on his experiences in dealing with people of this nature.

"Q. And Mr. Weinberg had dealt with people of this nature, hadn't he?

"A. Yes, that's correct.

"Q. Because he was a con man.

"A. That's correct.

"Q. Now, you have referred to devious nature. Did Mr. Weinberg spell that out for you?

"A. Not in real specifics that I could give you examples. He said he was cautious. He would offer a deal and then when you actually started pursuing it he asked a lot of questions. He suspected him of checking us out and things like that.[32]

"Q. He suspected—

"A. Stowe, of checking us out.

"Q. Did he indicate why he had that suspicion?

"A. Just a feeling he had.

"Q. But he was not very specific?

"A. No, he wasn't.

"Q. What about Mr. Amoroso?

"A. His impressions were primarily based on his conversations with Weinberg.

"Q. So we are really relying on Mr. Weinberg at this point?

"A. That's correct.

"Q. Would it be fair to say that we are really relying upon Mr. Weinberg's impression up to the period of November 15, 1979?

"A. I would say that to be correct.

"Q. Because you did not, as I understand it—and correct me if I'm wrong—you did not personally review the tapes as of that time?

"A. No, I did not.

"Q. Is there any reason why you did not review those tapes?

"A. Primarily because of the involvement in such a wide scope of investigation and this was an area that we did not have as as top priority at that time." Hearing Transcript, November 13, 1980, 443–446.

Again another indication of the authority of Weinberg is made clear by Good's response to certain questions by the Court concerning Mr. Weinberg and the lost tapes.

"THE COURT: Had you received any information that certain tapes made by Mr. Weinberg either relating to this case or some other case involving Abscam may have been either lost or stolen?

"A. Yes, I did.

"Q. When did that information come to your attention?

"A. I believe it was in January of '80 when he came up from Florida and brought some tapes with him and his bag was broken into at the airport.

"Q. His bag was broken into?

"A. Yes.

"Q. Do you know what was stolen from his bag?

"A. Cigars and some tapes.

"Q. Do you know what else may have been in the bag?

"A. His clothes.

"Q. And a tape recorder?

"A. And a tape recorder.

"Q. A tape recorder was not taken?

"A. I don't believe so.

"Q. Clothes were not taken?

"A. Clothes were not taken.

"Q. The tapes were taken?

"A. Yes.

"Q. And the cigars were taken?

---

32. The transcripts of the calls between Stowe and Weinberg which were recorded would not support this contention.

"A.  And the cigars.

"Q.  Did that arouse suspicion at all?

"A.  As far as Weinberg is concerned?

"Q.  And his activities.

"A.  No, it didn't.

"Q.  What were the contents of those—how many tapes were taken?

"A.  I think there was four or five tapes.

"Q.  Do you know how many conversations were on those tapes?

"A.  No, I don't.

"Q.  Probably more than four or five?

"A.  I would doubt it because at that particular point we had told him to use a separate tape for each conversation and he had done that.

"Q.  You mean if those conversations were pertinent?

"A.  If they were pertinent, right.

"Q.  And whether it was pertinent or not depended upon Mr. Weinberg?

"A.  Yes."  Hearing Transcript, November 13, 1980, 451–453.

The fact that there were certain problems with Weinberg by virtue of his lack of memory at times did not appear to trouble the agents as is brought out in the answers of Mr. Good in response to questions from the Court.

"THE COURT:  All right.  With respect to these tapes, these four or five tapes that were lost, were you briefed as to the conversations contained on those tapes?

"MR. GOOD:  No, I wasn't.

"Q.  Who was?

"A.  I don't think anybody could recall. I don't think Weinberg could recall exactly what tapes were lost and what ones weren't and he wasn't able to identify what conversations were lost.

"Q.  He was not able to identify the persons involved?

"A.  Right.

"Q.  Without naming any names do you know how many persons he had perhaps spoken to in that period of time?

"A.  No, I do not.

"Q.  But this was in Miami?

"A.  In Florida, yes.

"Q.  In the Florida area.  Did you not feel it was important to determine what may have been said in those conversations?

"A.  If we could have identified what tapes were missing and who the parties were involved we would have made an effort.

"Q.  Mr. Weinberg could not do that?

"A.  He couldn't, no.

"Q.  Didn't that strike you as a little unusual?

"A.  No, not really because he gets so many phone calls in the course of a couple of weeks that its pretty hard for him to keep track unless he has the tape of exactly who he calls and exactly who called him.[33]

"Q.  So what you're saying is in order to really recollect what had happened in any particular call Mr. Weinberg would really have to have a tape or notes?

"A.  I would say that, you know, to be specific, yes.

"Q.  And he never kept notes?

"A.  No, he didn't.

"Q.  And this was a matter, a factor, I take it, that was known to you.

"A.  That's correct.

"Q.  Did you ever instruct him to keep notes.

"A.  No, I didn't."

In short, this Court concludes that Weinberg was allowed to operate without clear guidelines.  He was not required to keep logs of his contacts with other persons even though those contacts were made out of the presence of FBI agents.  He was not required to keep notes of conversations he

---

33.  For this very reason, and since this matter was known to the FBI, it would seem that Mr. Weinberg would have been required to either keep a log or make notes after all telephone conversations.

had and he was not required to report at specific times for debriefing. He was not required to submit written reports on unrecorded calls, or those portions of recorded calls which were unrecorded. Moreover, the agents at times relied upon Weinberg's "impressions" as to whether or not they should make their next move. In this case, the telephone call of November 15, 1979, was based not upon facts known to the agents or even facts related to the agents by Weinberg; the call was based upon the impressions of Melvin Weinberg.

### D. The Failure to Require Written Reports in Abscam.

Another criticism leveled at Abscam by the defendants is the failure of the FBI, and the Department of Justice, to require agents to submit written, as opposed to oral reports. The government concedes that few if any 302 reports were made in these cases, and in particular this case. Weinberg, who was involved in the several Abscam cases, and who professed that his memory was not that good, would orally report to Amoroso, who in turn would orally report to Good, who in turn would orally report to his superiors, and so on up the ladder. It was because of this failure to require written reports, that superiors may have made decisions which they thought were based on facts, which were only based upon the impressions of Melvin Weinberg. This, of course, relates to the issue of who authorized the offer of a bribe to Jenrette since there is no written support for such an offer. It is quite clear then that the decision to initiate a bribe offer was made without probable cause to believe that Jenrette had ever accepted a bribe in the past, or had ever been involved with the law, or that he would accept a bribe at this time. It was also made without even a reasonable suspicion that he would accept a bribe because the decision to initiate the bribe was made by Weinberg. Since there were no written reports, it is hard to understand how the upper echelon of the Bureau or the Department of Justice could have done more than to rubber stamp a decision by the lower echelon to offer a bribe to a particular individual.

Such a procedure appears incredible when one considers the stakes involved. This was not an operation involving known or suspected criminals in the drug trade; this was an operation which was to have a lasting effect on the public's view of elected public officials, and an operation that would reach into the halls of the Congress of the United States. Moreover, this was not a routine "sting" operation where the government sought to attract persons who had *already committed* a crime or crimes, or who were suspected of already having committed crimes. It is for this reason that the Court stated early on that it is important to distinguish each one of the so-called Abscam cases, since it is quite possible that in some of the other cases the agents did have a reasonable suspicion that at least some of the individuals involved had participated in criminal acts or were likely to participate in criminal acts. In the case of Jenrette and Stowe, it was clear that what the government sought to determine was whether an elected government official could be induced to commit a crime by a convicted professional con man. It was nothing more than a test of the integrity and moral fiber of a member of Congress, a test which he failed to pass.

### V

Having discussed the more pertinent facts in this case, and some of the criticisms leveled at the Abscam operation in general, the Court now turns its consideration to the specific complaints made by the defendants.

First, the defendant criticized the failure of the government to make discovery pursuant to the orders of the court and the Federal Rules of Criminal Procedure. Specifically, the defendants complain that the government (1) failed to provide complete information concerning Weinberg's compensation, (2) failed to furnish information relating to the background of the discussions between Weinberg and Stowe concerning certificates of deposit, (3) failed to

furnish information on when it was decided to use Stowe to "get a politician", and (4) failed to furnish information concerning any connection between the South Carolina investigation of Jenrette and his investigation in Abscam.

As has already been noted, it is unclear exactly how much Weinberg has received and is to receive as the result of his activities in this case and the related cases. The significance of that information however is not the exact amount he did recover or is expected to recover, but whether his receipt of funds would cause a possible bias which should be brought to the attention of the jury. In this case, it was abundantly clear to the jury that Weinberg had received and was to receive a considerable amount of money as the direct result of his involvement in these cases. The record also makes clear that the longer the operation and the more successful the operation, the more Weinberg was likely to receive. Such evidence was completely and properly exploited by the defendants and argued to the jury. The unanswered questions raised by the defendants concerning Weinberg's compensation, weighed against the government.

■ Over all, there seemed little to support the credibility of Weinberg. Notwithstanding the protestation of the government agents, or their instructions to Weinberg, they were unable to completely monitor Weinberg. He had no specific directions to report every telephone call or to record every telephone call, he was not systematically debriefed concerning his activities, he had convenient lapses of memory, and he had a motive to lie. Moreover, his credibility was impeached by his background, a convicted con man, who stood to gain not only more money from Abscam depending upon how many government officials he could bring into the net, but some form of absolution from his probation requirements. Why then did the jury convict the defendants on the questionable word of Weinberg? The answer is simple, they did not; rather, they convicted the defendants on the audio and video tapes introduced in

evidence, tapes which were clearly admissible. Thus, this Court cannot find that the failure of the government to produce additional information concerning the compensation paid to Weinberg would have had any effect in this case. In short, one picture in this case was worth a thousand words. One cannot help but feel revulsion and disgust at seeing an elected government official accept a relatively small amount of money in exchange for agreeing to violate his public trust.

Indeed, it seems unlikely that any jury can seriously consider the defense of entrapment when they actually see the crime committed. In most cases where an entrapment defense is raised, there is almost overwhelming evidence that the defendant committed the offense. For example, the defense is often raised in narcotics cases and in cases involving charges of sexual solicitation. In those cases, evidence concerning the commission of the crime and evidence supporting the defense of entrapment is usually submitted by way of testimony, and the jury then weighs the testimony to determine the issues of whether the crime was committed and whether there was inducement and predisposition. Even then, it is rare that a jury is convinced that a man who committed the crime was not predisposed to do so. Realistically then, the average citizen apparently finds it difficult to release a defendant based on entrapment when he knows the defendant committed the crime. It is not difficult to imagine then that it is extremely difficult for a citizen to apply the defense of entrapment when he actually observes the commission of the offense on a video tape and need not rely on testimony to make this determination. This is not to suggest that it was unfair for the Abscam investigators to make audio and video tapes to record the commission of the crime, since in the view of this Court, every reasonable and lawful means should be used to detect, record and present evidence of the commission of the crime. Moreover, audio and video tapes allow the finder of fact an instant playback, a chance to observe the actual demeanor of the defendant and the demeanor

of the officers and agents of the government, and to hear their very words. But realistically, once the jury has done so, it seems virtually impossible to convince them that the defendant was entrapped. And this is especially true where the defendant is an elected and appointed official who is sworn to uphold the law.

Thus, even assuming that the government should have made a full disclosure of other facts, it seems extremely unlikely that it would have changed the course of this trial. The Court after considering the various contentions made by the defendants, other than the issue of entrapment as a matter of law and violations of fundamental fairness, finds them all without merit.

## VI

■ The only issues remaining then are whether the actions of the government reach "a demonstrable level of outrageousness", *see Hampton v. United States, supra,* 425 U.S. at 491–495 & n. 7, 96 S.Ct. at 1650–1653 & n. 7, (Powell, J. concurring), and whether there was entrapment as a matter of law. The first issue is no longer open to question in this circuit in view of the decision in *United States v. Kelly, supra.* That court considered similar claims of outrageousness and alleged violations of fundamental fairness in yet another Abscam case and reversed the district court's granting of the defendant's motion for judgment of acquittal. The court noted that, "[w]ithout further Supreme Court elaboration, we have no guide to a more dynamic definition of the outrageousness concept, and no warrant, as lower court judges, to devise such a definition in advance of any signal to do so from higher authority." *United States v. Kelly, supra,* 707 F.2d at 1476 & n. 13 (Ginsberg, J. concurring). Kelly, at the time a Member of Congress, was also caught in the web of Abscam. In view of the decision in *Kelly,* the defendants' claims for acquittal based upon outrageousness of conduct or violations of fundamental fairness must be denied.

While the Court finds that the conduct of the government in reaching out to bring Jenrette and Stowe into Abscam and in using a con man to do so, when there was no evidence that either man had previously committed a crime or that they were presently ready, willing and able to commit a crime at the time approached by Abscam personnel, at least bordered on the outrageous, the *Kelly* decision makes any further discussion of this issue unnecessary.

■ As to entrapment, the Court finds no basis to conclude that Jenrette was entrapped as a matter of law. His involvement before accepting the bribe was relatively short, and, as the Court has already found, Part IV B, *supra,* there was ample evidence for the jury to find that, even though induced to commit the crime, he was predisposed to do so. His own words and actions will forever haunt him in that regard.

■ The issue of entrapment as it relates to Stowe raises a more difficult question. Like the case of Jenrette, the jury had the opportunity to listen to the many taped conversations between Stowe, Weinberg and Amoroso and to observe Stowe on video tape. But, as the Court has already observed, it is not realistic to believe that a jury, actually observing the defendant commit the crime, is going to release him under a theory of entrapment. What makes this case more difficult is that Weinberg actively pursued Stowe for more than a year, promising to assist him in obtaining legitimate financing for a legitimate project. Stowe was not interested in bribery, and Weinberg knew or should have known that. There is no evidence that he was interested in bringing Jenrette into his financial picture. But Stowe was the key to Jenrette and there Weinberg, unguided by any instructions from the federal agents, continued his con on him and worked him by suggesting that he was about to receive financing. When Stowe seemed to tire of the game, Weinberg would give more hope. This was the classic stick and carrot game, the classic con game and the government had retained an expert in its execution.

The government was never after Stowe—the target was always "some congressman" presumably Jenrette.[34]

However, the issue of entrapment, was fully set forth and presented to the jury and they were carefully instructed in this case. They were instructed as to inducement and as to predisposition. They had a chance to observe the tapes, both audio and visual, and to weigh the actual words of Stowe in determining whether he was predisposed to commit the crime. This Court finds the actions of the government in pursuing Stowe through Weinberg for well over a year to amount to outrageous conduct, since throughout that time, Weinberg was attempting to con Stowe into committing a crime. But the Court is without any guidelines since this issue directly relates to the issue of fundamental fairness, and due process. Once again, the Court finds it must stay its hand in view of the decision in *Kelly*. The Court observes however, as did the district court and the court of appeals in *Kelly*, that the Abscam drama was "an unwholesome spectacle". See 228 U.S. App.D.C. 55, at —, 707 F.2d at 1477.

The motions are denied.

### ORDER

This comes before the Court on the motions for judgment of acquittal, or in lieu thereof, for a new trial, filed by the defendants. After giving careful consideration to the motions, and the opposition thereto, together with the arguments of counsel, and the record in this case, the Court concludes, for the reasons set forth in the Opinion filed herein, that the motions must be denied. In view of the above, it is hereby

ORDERED that the motions for judgment of acquittal, or in lieu thereof, for a new trial, are denied, and it is further

ORDERED that the Probation Office shall prepare a Presentence Report as to each defendant, said report may be prepared by the Probation Office in this District,

or if directed by the Probation Office, by a Probation Office in another District, with final recommendation by the Probation Office in this District, and it is further

ORDERED that the defendants may remain on the same bond with the same conditions, and that once the presentence reports are completed, the defendants shall report to the Court on the date to be set for sentencing, and in the event the defendants fail to report, the Court shall issue a bench warrant for their arrest, and it is further

ORDERED that in the event the parties intend to file sentencing memoranda, said memoranda shall be filed not less than ten calendar days before the date set for sentencing.

---

**34.** It seems unlikely that the agents did not know that the congressman referred to by Stowe was Jenrette. Any child in school could have determined that in a matter of minutes by finding out who represented the Sixth Congressional District in South Carolina.